Filed 8/24/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S073205 |
| v. | ) | |
| | ) | |
| JACK EMMIT WILLIAMS, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. CR49662 |
| _____ | ) | |

A jury convicted defendant Jack Emmit Williams of the 1993 attempted robbery and first degree murder of Yvonne Los.[1]  It found true a robbery special-circumstance allegation and enhancement allegations that a principal was armed with a firearm.[2]

Defendant was also convicted of the robbery[3] of James Garcia; attempted kidnapping with intent to rob[4] of Debby Phillips and of Deena Nolin; robbery of Dale Nonies; attempted robbery[5] of Barbara DeGeorge; accessory to the robbery[6] of Patricia Smith Estep and of Charles Estey; robbery of Glynn Brodbeck; and

---

[1]    Penal Code sections 664, 211, 187, subdivision (a).  All further statutory references are to the Penal Code unless otherwise indicated.
[2]    Former sections 190.2, subdivision (a)(17)(i), 12022, subdivision (a).
[3]    Section 211.
[4]    Sections 664, 209, subdivision (b).
[5]    Sections 664, 211.
[6]    Section 32.

1

attempted kidnapping with intent to rob of Glynn Brodbeck. As to each count the jury found a principal was armed with a firearm. For the counts involving Dale Nonies and Glynn Brodbeck, it found that defendant personally used a firearm.[7]

The jury returned a verdict of death for the murder. The trial court denied a motion to modify the verdict and sentenced defendant to death.[8] It also sentenced defendant to a total of 24 years six months, the sentences to run consecutively. This appeal is automatic.[9] We affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

### A. Introduction

In May 1993, defendant induced a group of teenagers to form a gang. Between May 14 and May 20, 1993, gang members committed a series of robberies, attempted robberies and kidnappings, carjackings and murder. Defendant was convicted of these offenses either as a direct perpetrator, a conspirator, an aider and abettor or an accessory.

### B. Prosecution's Guilt Phase Evidence

#### 1. The Crimes and Related Events

##### a. Events of May 14, 1993

In the early morning of May 14, 1993, while defendant drove around Moreno Valley with Mondre Weatherspoon and Alonso Dearaujo, the three decided to commit a robbery. Defendant had a .380-caliber handgun that was to feature prominently in the ensuing crimes. He directed Weatherspoon to the parking lot of a Circle K convenience store and gave Dearaujo the gun. He and

---

[7]     Section 12022.5, subdivision (a).
[8]     Section 190.4, subdivision (e).
[9]     Section 1239, subdivision (b).

2

Weatherspoon told Dearaujo to go into the store, pull out the gun and demand money.

James Garcia was working at the Circle K when Dearaujo entered, pointed a gun and told him to "give him all the money or he'd blow my . . . head off." Garcia emptied the cash register into a bag, then turned around and started to count to 100 as directed. When the doorbell chimed, Garcia looked and Dearaujo had gone. He locked the door and called the police

Dearaujo ran back to the car and Weatherspoon drove away. Defendant took his gun back and the three split the stolen money.

### 2. *Formation of the Gang*

The same night, a group of young people ranging in age from 13 to 19 gathered at the home of 17-year-old Natalie Dannov, defendant's girlfriend. Defendant had called the meeting and invited the participants. According to Dannov and others, defendant talked about forming a gang to commit crimes and "have fun." Stolen money would be used to buy a house and invest in stocks. Those over 18 would be given bank accounts. Defendant said the gang would be called the Pimp-Style Hustlers. Gang members would earn "stripes" or "G stripes" by committing crimes, carjackings and robberies. At one point, defendant demonstrated how to commit a carjacking, using Dearaujo as his mock victim. The victim was to be put in the car trunk. If a target resisted, defendant directed his members to "cap 'em or shoot 'em." Although others also spoke, defendant was the leader. After his presentation, several people, including defendant, got into a van driven by John Howell and went out looking for someone to carjack.

### 3. *Attempted Kidnappings for Robbery of Debby Phillips and Deena Nolin (Counts 4 and 5)*

Defendant directed Howell to the parking lot of Dilly's night club. Defendant gave George Holland the .380-caliber handgun and told him to commit

the carjacking because he was the oldest. He also told 14-year-old Andrew Cannioto to accompany Holland. Cannioto had a pocket knife.

Seeing Deena Nolin and Debby Phillips getting into a car outside the club, Holland approached the driver's window. When Nolin rolled it down, Holland pointed a gun through it, and told Nolin to get into the back seat. Cannioto approached the passenger side where Phillips sat. The women got out of the car, but Nolin stopped Phillips from getting into the back seat. She said Holland could take the car and their purses, but they would not stay in the car. Phillips ran toward the night club. Holland and Cannioto ran back toward the van. The passengers told them not to get in and they kept running. Around 30 minutes later, defendant and Weatherspoon picked them up. They drove to a hotel where Holland's sister had rented a room to celebrate.

### 4. Robbery of Dale Nonies (Count 6)

Later that night, defendant, Weatherspoon, Holland and Steven McNair went to find another carjack victim. Holland drove. Around midnight, they saw Dale Nonies and his girlfriend, Genalyn Doronio, saying goodnight in front of Doronio's house. Nonies's white Ford Escort was parked at the curb. Defendant and Weatherspoon got out of the car. Defendant pointed his gun at the couple and demanded Nonies's car key and wallet. Nonies asked to keep his wallet and other keys. The robbers agreed taking only his money and car key.

Defendant and Weatherspoon drove off with Nonies's car, followed by Holland and McNair. In a secluded area, they stripped the car and rolled it into a ditch.

4

### b. Events of May 15, 1993

#### 1. Attempted Carjacking of Barbara DeGeorge (Count 7)

On May 15, defendant told gang member Anthony Post to carjack a vehicle so defendant could drive it to the prom. After two aborted attempts, defendant and Post went to the parking lot of a theater complex. They saw a woman getting out of a car. Defendant said, "she'll be easy because she hasn't put her keys away yet." Post was reluctant, but defendant gave him the gun and "pumped [him] up." Post approached the woman, lifted his shirt to display the gun in his waistband, and demanded her car keys.

The victims, Barbara DeGeorge and her 10-year-old daughter Lisa, were on their way to the movies. When Post displayed the weapon, DeGeorge and her daughter ran. Post ran toward defendant, who waved him away. Post hid the gun in a field and retrieved it later.

#### 2. Robbery of Patricia Smith Estep and Charles Estey (Counts 8 and 9)

Later that night, defendant sent Dearaujo and 13-year-old gang member Christopher Lyons to rob a liquor store. Dearaujo had defendant's gun; Lyons carried two knives. When they got to the liquor store, it was closing. They left.

They passed a building with the lights on and people inside. Lyons said, "let's rob them." Lyons took the gun and they entered. The building housed a Los Angeles Times distribution center owned by Charles Estey who was there with his mother, Patricia Smith Estep. Lyons and Dearaujo ran into the office with Lyons wearing a stocking mask. Initially, Estey thought his friends were playing a joke on him, even as the gunman pointed the gun at his face. Dearaujo held a knife to Patricia Smith Estep's back and told her not to look at him. Ordered to get on the floor, Estey said, "Knock it off, Manny . . . . This has gone far enough." Seeing the knife pointed at his mother, Estey realized the robbery was not a joke. The

5

robbers took Estey's wallet and his mother's purse. Dearaujo told Lyons, "Let's cap them and get out of here." Estey offered them his car keys, saying, "We never saw you once, just go." They left.

Dearaujo and Lyons met defendant. They gave him the purse and wallet that together contained about $100. Defendant kept the money and commended them for a "good job."

### c. Events of May 19-20, 1993

### 1. Murder of Yvonne Los (Counts 1 and 2)

On the evening of May 19, 1993, defendant was part of a group planning to drive to a party in Anaheim. As he and others were getting into a car, Dearaujo and Lyons came over. Defendant asked if Dearaujo could come with them, but the group was too large to fit in the vehicle. Defendant told Dearaujo and Lyons to go to the Family Fitness Center and "get a car." Defendant told Dearaujo to carjack a light-colored sedan and put the victim in the trunk. He gave Dearaujo his gun along with a jacket and a bandana to cover his face. He described where to meet him afterwards.

Dearaujo and Lyons walked to the parking lot of the fitness center and waited for an "appropriate" victim. Yvonne Los, an Air Force nurse and mother of two, pulled into the lot. When her car passed them, Dearaujo said, "This is it, let's do it." As Los sat in the driver's seat, Dearaujo tapped the car window with the gun barrel and said, "Shh." Los looked frightened and locked the doors. Lyons tried to open the passenger door. A witness heard him yelling, "get out of the car, get out of the fucking car." When Los started the car, Dearaujo shot her. The car rolled backwards, striking another vehicle. Los tapped her car horn and then slumped over. Dearaujo and Lyons fled.

6

An off-duty police officer heard the crash and responded to find Los shot in the neck and unresponsive. A bullet had severed Los's carotid artery causing death by exsanguination.

Later, Dearaujo and Lyons met defendant and reported what happened. Defendant told them to find someplace to stay that night and to come to Dannov's house the next day.

### 2. Post Murder Celebration

The following afternoon, the mood at Dannov's house was festive. Defendant referred to Dearaujo as "Charles Manson." He awarded Dearaujo two stripes, and Lyons one, for a "good job." When a television newscast aired a photograph of Los, Dearaujo said, "I smoked that bitch." When Los's fiancé appeared on screen and said they were planning to marry, Lyons said, "Not no more."

### 3. Robbery and Attempted Kidnapping for Robbery of Glynn Brodbeck (Counts 10 and 11)

That night, defendant, Weatherspoon and James Handy tried to commit another carjacking. Defendant took the gun. Defendant and Weatherspoon approached Glynn Brodbeck, who was parked in a Taco Bell lot waiting for his fiancée to finish her shift. Defendant tapped on the driver's window and told Brodbeck to get out of the car. Brodbeck saw defendant with a gun and two other men standing nearby.

Defendant demanded his wallet, but Brodbeck had left it at home. Handy "frisked" him and took his cigarettes. Weatherspoon took Brodbeck's keys and opened the trunk, where he and defendant planned to put their victim. When the robbers looked into the trunk, Brodbeck ran toward the Taco Bell. Defendant shot at him, but Brodbeck slipped. As he fell, he heard the bullet pass by. He recovered and kept running until he entered the restaurant where he called police.

7

Defendant, Weatherspoon and Handy left the scene, dropping Brodbeck's keys in the parking lot.

### 4. *Defendant's Arrest and Statement to Police*

The murder investigation led police to George Holland who revealed defendant's name. Police arrested him on May 22, 1993. En route to the county jail, defendant asked how much time he could get for carjacking. Defendant also commented that a detective had called him "David Koresh," adding he did not think he was Koresh, but guessed he was a sort of leader.

Police interrogated defendant on May 22 and 23. He admitted calling the meeting at Natalie Dannov's house where he and others discussed committing carjackings. He also admitted proposing to put the money into a common investment pool and to coining the name Pimp-Style Hustlers. He denied being the "ringleader," claiming he was the "second hand man" to Mondre Weatherspoon.

Defendant admitted either planning or committing the Circle K robbery, the Nonies robbery and the attempted carjacking of Brodbeck at Taco Bell. He was present at the attempted carjacking of Phillips and Nolin and the attempted carjacking of DeGeorge. Defendant conceded he divided the money Dearaujo and Lyons took from Charles Estey and his mother. As to the murder, defendant admitted knowing that Dearaujo was "gonna jack a car," giving him a gun and planning to meet him afterwards. He denied ordering Dearaujo to commit the crime.

## C. Defendant's Guilt Phase Evidence

Defendant called Jason Domke, a friend of Christopher Lyon's. Domke testified that Lyons showed him a knife and asked him if he wanted to go "jacking" with him. Domke testified he saw Lyons retrieve a gun and a bag of

shells from Natalie Dannov's house.  Lyons showed him a woman's stolen driver's license.

### D.  Codefendant Dearaujo's Guilt Phase Evidence[10]

Dearaujo called Keisha Lawrence, who had been married to John Howell; she had pled guilty to two counts of being an accessory to attempted kidnapping for robbery and served eight months of her one-year sentence.  Lawrence believed Dearaujo was slow-witted and wanted to fit in.  He was "picked on," "punched" and manipulated by defendant and others in the group.  Defendant was the leader the others looked up to.  She corroborated defendant's involvement in the attempted carjacking of Debbie Phillips and Deena Nolin and the robbery and carjacking of Dale Nonies.  Following the murder, Lawrence called defendant and asked what he was going to do about the homicide for which she blamed him.   He said, "It's already done.  The bitch is dead."  When she asked about Dearaujo, defendant said Dearaujo was fine; he had the situation under control and she should not worry.

### E.  Prosecution's Penalty Phase Evidence

#### 1. Victim Impact Evidence

Yvonne Los's family and friends described the impact of her death.  Her fiancé, ex-husband, parents, two siblings and two children represented the family. They were joined by two Air Force coworkers .

Los was the oldest child in a close-knit family and had grown up taking care of her younger siblings.  Her desire to help people led her to choose nursing as her profession.  She joined the Air Force to further her education and was proud

---

**10**     Defendant was tried along with Dearaujo before separate juries.  Dearaujo's convictions are not involved in this appeal.  The evidence summarized here was heard by defendant's jury.

of her military service. She rose to the rank of staff sergeant, a difficult achievement for medical personnel. She did volunteer work and cared for a disabled boy. Committed to her Catholic faith, she loved her two children and instilled high moral values in them. She was a person who loved unconditionally.

Each relative described learning of Los's death, their feelings of loss and grief and the impact of her death on the extended family. Her father testified about the pain of losing a child. Siblings recounted the family's sadness and the pall cast over family gatherings. Her son, age 10, was five when she died and remembered her as a "nice mom." Her daughter, 15, testified Los was a kind person and a role model. She thought of her mother every day. She remained upset that she and her mother had argued on the night of the murder and that she had gone to bed without telling her mother good-night. Los's ex-husband described how difficult it had been for him and their children after her death. He returned from Germany, where he was stationed, to be with the children and take them back to Germany. Witnesses described her funeral and burial in Iowa and a posthumous ceremony where an Air Force dormitory for nurses was named in her honor. A videotape of the ceremony, an unusual honor, was shown to the jury along with a montage of still photographs.

*2. Violent Criminal Activity*

The prosecutor presented evidence in aggravation documenting defendant's criminal activity involving the "use or attempted use of force or violence or the express or implied threat to use force."[11]

---

[11] Section 190.3, factor (a).

Mario Loa testified that in September 1991 he was attacked by defendant and the ex-boyfriend of a woman Loa was dating. Trina P. testified that in January 1992, defendant hit her in the mouth following a disagreement.

A number of witnesses testified to defendant's violent crimes while in custody. Inmate Donald Deloney testified how, in March 1994, he and defendant joined together to intimidate and assault other inmates. Defendant beat up an inmate to secure a lower bunk for Deloney and forced another inmate to orally copulate defendant. Deloney and defendant robbed at least 13 inmates. They took commissary cards and physically threatened Timothy Goodfield. After the incident with Goodfield, defendant and Deloney were reassigned to high security segregated housing.

In May 1994, defendant fought with inmate Mark Sanchez. That same month, he ordered a Latino inmate to attack a White prisoner who had a swastika tattoo. In July 1994, defendant fought with inmate Mark Heinzen, believing he was gay. In August 1994, defendant assaulted Dale Foster because he wanted Foster's bunk. In December 1995, defendant fought Arturo Alatorre, who had complained that defendant exceeded his phone time.

### F. Defendant's Penalty Phase Evidence

Defendant's father testified he was a "normal kid," who had experienced problems in middle school that were resolved. He dropped out of high school and an alternative school. At 17, defendant went to work in his father's landscaping business. At 18, he began living away from home intermittently. Defendant's father was acquainted with most of his friends. He had been unaware defendant had any problems with substance abuse or violence. Defendant's arrest devastated his father who could not imagine life without his son.

11

Defendant's mother abused drugs when defendant was growing up and would visit out-of-town relatives for months at a time. Occasionally, she took her children.

Defendant's sister described him as helpful, respectful and well-liked.

Rahin Brown was defendant's neighbor and friend in 1987. They played basketball and football together. Brown left home, joined the Navy, and went to college. He remained in touch with defendant who was like a member of Brown's family. Brown was unaware of any bad behavior on defendant's part. In spite of defendant's convictions, Brown remained his friend and believed he had good qualities.

Velma McDowell lived next door to defendant's grandmother. He ran errands for her and mowed her lawn. He was respectful and "a good kid."

Defendant's sixth and seventh grade teachers also testified about his good character.

Anthony Casas, a private investigator and litigation consultant, worked for the Department of Corrections for 23 years. He described the prison classification system. Based on his case review and interviews with defendant, he opined that if sentenced to life without parole, defendant would be sent to a level 4 facility, the most restrictive in the system. Casas described level 4 facilities, routines and disciplinary actions. Casas believed defendant would adapt and do well in that setting. Notwithstanding his "infractions" while in custody, Casas believed he would not be a management problem in prison.

Defendant also presented evidence that Mario Loa failed to initially name him as one of his assailants. A district attorney investigator testified that the attack on the inmate with the swastika tattoo was not committed by a Latino inmate acting on defendant's orders, but by someone else.

12

### G. Prosecution Rebuttal Evidence

Correctional Officer Martin Trochtrop found homemade weapons concealed in the ceiling of defendant's cell. Samuel Francis, a correctional officer for over 17 years, was called to counter Casa's opinion that defendant would pose no threat at a level 4 facility. Francis testified that an inmate with a record of weapons possession and assaults on other inmates might be an administrative problem. In his opinion, such an inmate would continue to demonstrate a propensity for violence.

## II. GUILT PHASE ISSUES

### A. Use of Restraints

Defendant contends the trial court abused its discretion when it ordered the use of a leg restraint without a finding of manifest necessity. (*People v. Duran* (1976) 16 Cal.3d 282, 290-291.)[12] He argues further that the court's decision violated his rights under various constitutional provisions. (U.S. Const., 5th, 6th & 8th Amends.; Cal. Const., art. I, §§ 1, 7, 15, 16 & 17.) Defendant has forfeited the claim and, in any event, fails to show prejudice.

Following preliminary instructions to the jury, and outside the jury's presence, the trial court remarked, "I was approached by the security people that

---

[12] "As to this and virtually all other appellate claims, defendant contends that an issue raised and decided in the trial court resulted in constitutional violations, but he did not present those constitutional theories below. In such instances, it appears that (1) the appellate claim is the kind that required no [specific argument] to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court was asked to apply . . . . To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] In the latter case, no separate constitutional discussion is required or provided where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Contreras* (2013) 58 Cal.4th 123, 139, fn. 17.)

their intention is to request at some point [defendant] wear, at least initially, the leg restraint locking-type of device to prevent his escape or any type of other security issue. As I understand it, although I have never seen it, it is an unobtrusive device which is not visible to any member of the jury. As long as there's no attempt to rapidly run, it remains flexible. . . . [I]f he tries to run, it's supposed to lock . . . . I've been told that there are a number of incidents [since defendant] has been in custody that have occurred in jail that apparently support the sheriff's concern that some, at least minimal, restraints ought to be employed in this case." Defense counsel responded, "I told [defendant] to expect this. So I don't think at this point I'm in a position to comment further, but other than to say [defendant] has never been a problem for transportation, to my knowledge. I think the incidents that may have occurred in the jail are pretty old at this point. Other than that, I told [defendant] already to expect to have the leg restraint. He's seen it already and knows what it is." Addressing the bailiff, the court said, "[I]f there are any concerns [about] that regular restraint, I assume that you will or someone from your office will make the presentation or ask us to revisit the issue." The bailiff said, "yes."

Later, during a recess, defendant complained the restraint was "very, very uncomfortable" because "[i]t's cutting me." The prosecutor suggested leg shackles. Defense counsel replied, "I don't think it would be to[o] oppressive to sit. We can find out tomorrow, and maybe leg shackles would be the alternative. Since he doesn't have to stand up, the jury wouldn't see it, but I'll alert the court."

The last reference to defendant's restraint was made in the context of a discussion about the use of restraints on prosecution witnesses. During that discussion, the prosecutor noted that defendant and Dearaujo were "not restrained. They don't have handcuffs on. As far as the jury knows, they're greatly unrestrained."

14

"Under *Duran*, *supra*, 16 Cal.3d 282, a criminal defendant may be subjected to physical restraints in the jury's presence upon 'a showing of a manifest need for such restraints.' [Citations.] This requirement is satisfied by evidence that the defendant has threatened jail deputies, possessed weapons in custody, threatened or assaulted other inmates, and/or engaged in violent outbursts in court. [Citations.] [¶] The trial court's decision to physically restrain a defendant cannot be based on rumor or innuendo. [Citation.] However, a formal evidentiary hearing is not required. [Citation.]" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1031-1032.) The trial court's determination is reviewed for abuse of discretion. (*People v. Combs* (2004) 34 Cal.4th 821, 837.)

Defendant failed to object to restraints and has therefore forfeited his claim on appeal. (*People v. Foster* (2010) 50 Cal.4th 1301, 1321.) At no time did the defense request a formal hearing on the question. In any event, we need not consider any abuse of discretion because no evidence suggests that any juror saw the restraints. (*Id.* at p. 1322; see *People v. Manibusan* (2013) 58 Cal.4th 40, 85.) "[W]e have consistently held that courtroom shackling, even if error, [is] harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." (*People v. Anderson* (2001) 25 Cal.4th 543, 596.)

The only record regarding the restraint was the court's initial comment that it would not be visible to the jury and the prosecutor's later observation that defendants did not appear to be restrained. Defendant cites nothing in the record to contradict these references. He did not testify at either phase of the trial and made a single passing reference to discomfort. No evidence suggests the restraint influenced him not to testify, affected his demeanor or impaired his ability to communicate with defense counsel. (*People v. Combs, supra,* 34 Cal.4th at pp. 837-839; see *People v. Manibusan, supra,* 58 Cal.4th at p. 87.)

15

Defendant claims *Deck v. Missouri* (2005) 544 U.S. 622, stands for the proposition that when restraints are used prejudice is presumed. We have previously rejected this construction of *Deck*. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99.) We noted "[i]n *Deck*, there was no dispute that the restraints were visible to the jury — a circumstance that courts consistently have viewed as inherently prejudicial." (*Id*. at p. 155.) We declined to presume the jurors viewed the restraint, and nothing in the record showed that they did so. (*Ibid*.) The same analysis applies here.

**B. Excusal of Juror No. 12 During Trial**

During the prosecution's case, the court dismissed a juror who improperly expressed an opinion about witness credibility then lied to the court about having made the statement. Defendant contends the excusal of the juror was an abuse of discretion and also violated his rights under various constitutional provisions. (U.S. Const., 5th, 6th, 8th & 14th Amends.)

*1. Background*

Juror No. 6 initially reported that Juror No. 12 said she was upset because James Handy, an in-custody prosecution witness, had been brought to court in handcuffs. Later, Juror No. 7 told Juror No. 6 that Juror No. 12 said the only reason Handy had been handcuffed was because he was African-American. Juror No. 12 herself was African-American.

Upon inquiry, Juror No. 12 admitted making the comment. The court explained a decision to restrain an inmate witness was based on whether the witness posed a security threat and was "not a racial decision." Juror No. 12 said the episode would not prejudice her against either side. She acknowledged that her "mistake" was, "I'm not supposed to give my opinions to others." At the prosecutor's request, the trial court also questioned Juror No. 7 about Juror No.

16

12's comment. She confirmed that Juror No. 12 had asserted "the black [prisoner-witnesses] are in shackles."

The prosecutor sought to excuse Juror No. 12 because she could not be fair and impartial. The trial court denied the request because the juror had said she could be fair to both sides and her comment concerned an ancillary matter.

The trial court told the jury that restraints were placed on a witness for security and should have no bearing on its evaluation of the witness's credibility. The trial court also reminded jurors they were not to discuss the merits of the case before it was submitted to them.

Nine days later, another juror reported comments by Juror No. 12. Juror No. 2 told the court that after Glynn Brodbeck testified, Juror No. 12 said, "the only truth lied [*sic*] in the parking lot and that everyone else was just lying." Juror No. 2 reported the comment had been made after the court's earlier admonition not to discuss the merits of the case. Juror No. 2 also said Juror No. 12's latest remark had been made in the presence of other jurors.

The matter was put over for several days before Juror No. 12 was questioned. She said she heard someone make a similar statement but denied it was she. She heard someone say "everybody in the courtroom was lying except the judge," but did not remember who made the comment. She volunteered she was "a strong-opinionated person," and suggested that "maybe somebody would not like for me to be on the jury, to go into deliberations or whatever." She wondered if she was being "pinpointed with things that are said or done as far as this particular trial is concerned." The court pointed out that the juror who had reported this comment was not the same juror who had reported the handcuffing comment. Juror No. 12 said she could be fair but felt like "I'm being attacked."

The remaining jurors and alternates were questioned. No one remembered hearing the statement Juror No. 2 reported. Alternate Juror No. 3 said he

17

overheard a juror say she was upset by a comment Juror No. 12 made. That remark could have been made on the day Brodbeck testified.

The prosecutor renewed her motion to dismiss Juror No. 12, saying the issue was whether Juror No. 2 was credible. She argued that Alternate Juror No. 3's recollection corroborated Juror No. 2's claim that Juror No. 12 had made the statement about witnesses lying. The prosecutor asserted that the new statement violated the court's admonition not to discuss the case and that Juror No. 12's denial "was not credible."

Over defendant's objection, the court removed Juror No. 12. Referring to the handcuff statement, the court noted that Juror No. 12 had said one of the things she learned from the incident was not to share her opinion with others. Nonetheless, the second statement attributed to her went "directly [to] the merits of the case" and showed Juror No. 12 had formed an opinion about the witness's credibility. This behavior violated the court's admonition not to do so until the case was finally submitted. The court held the juror had lied when denying she made the statement and that Juror No. 2 was credible.

The court found that Juror No. 12's misconduct was thrice improper. "First, she, in violation of the Court's order, formed an opinion about the merits of the case, and two, she expressed that opinion to other jurors, and three, when confronted with that, in my opinion she lied to the Court as to whether she made the statement in the first place." The juror was dismissed and an alternate seated.

### 2. Discussion

"The court may discharge a juror for good cause (see § 1089), which includes a failure to follow the court's instructions." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69.) "A juror who violates his or her oath and the trial court's instructions is guilty of misconduct." (*People v. Linton* (2013) 56 Cal.4th

18

1146, 1194.) "We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality. [Citations.] The demonstrable reality test 'requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [disqualification] was established.' [Citation.] To determine whether the trial court's conclusion is 'manifestly supported by evidence on which the court actually relied,' we consider not just the evidence itself, but also the record of reasons the court provided. [Citation.] In doing so, we will not reweigh the evidence. [Citation.]" (*People v. Wilson* (2008) 43 Cal.4th 1, 26.) We defer to the trial court's credibility assessments "based, as they are, on firsthand observations unavailable to us on appeal." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053.)

Section 1122 requires that after the jury is sworn and before opening arguments it be instructed about "its basic functions, duties and conduct," including that the jurors "shall not converse among themselves, or with anyone else, . . . on any subject connected with the trial." (§ 1122, subd. (a).) This jury was so instructed. Section 1122 also requires that "[t]he jury shall also, at each adjournment of the court before the submission of the cause to the jury, . . . be admonished by the court that it is their duty not to . . . converse among themselves, or with anyone else, on any subject connected with the trial, or to form or express any opinion about the case until the cause is finally submitted to them." (§ 1122, subd. (b).) Those admonitions were given as required. A juror's violation of these directions constitutes serious misconduct. (*People v. Majors* (1998) 18 Cal.4th 385, 423.)

Moreover, after the initial inquiry as to the handcuffing, the court again drew the jury's attention to the prohibition against discussing the case until it was

19

submitted to them.  Indeed, Juror No. 12 herself recognized she should keep her opinion to herself.

On this record, the trial court did not abuse its discretion in dismissing Juror No. 12.  The crux of the court's ruling was its credibility determination that Juror No. 2 was truthful and Juror No. 12 was not.  There is no basis to disturb that finding on appeal.  Juror No. 12 was well aware that she was not to form an opinion on any matter touching upon the case or to express an opinion to others.  Nevertheless, her second remark shows she had formed an opinion about witness credibility.  She then shared it with at least one other juror.  She compounded her misconduct by lying to the court.  The record supports her disqualification as a demonstrable reality.

### C.  Instructional Claims

#### 1.  *Lesser Included Offense Instruction*

Defendant contends the trial court erred by failing to provide, sua sponte, lesser include offense instructions on second degree felony murder, second degree murder and voluntary manslaughter.  He maintains the error violated his rights under various constitutional provisions.  (U.S. Const., 5th, 6th, 8th & 14th Amends.)  Because no substantial evidence implicated issues addressed in these instructions the trial court was not required to give them.

"The trial court must instruct on general legal principles closely related to the case.  This duty extends to necessarily included offenses when the evidence raises a question as to whether all the elements of the charged offense are present. . . .  [¶]  Nevertheless, 'the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense . . . .'  [Citation.]  Such instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser

offense, and that he is not guilty of the greater offense." (*People v. DePriest* (2007) 42 Cal.4th 1, 50.) "Substantial evidence," in this context, "is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

Defendant was charged with the felony murder of Yvonne Los. Because he was not the perpetrator, the prosecution proceeded on theories of aiding and abetting and conspiracy. Defendant asserts that the evidence supported instructions for the lesser included offense of second degree felony murder based on a target offense of discharging a firearm in a grossly negligent manner. (§ 246.3.) He also contends the jury could have determined that Los was killed during an intentional but unpremeditated shooting, thus constituting second degree murder. Finally, he argues he merely furnished a weapon knowing it might be used in a crime. Accordingly, his act "amounts to nothing more than criminal negligence supporting a voluntary manslaughter conviction."[13]

The evidence showed that carjacking was one of the crimes defendant formed his gang to commit. He trained them how to do a carjacking and said any resisting victim was to be shot. Before the Los killing, defendant had already

---

[13] We question whether a second degree felony-murder instruction would have been appropriate here. "[The] use of the second degree felony-murder rule [is] appropriate when the purpose of the predicate felony was independent of or collateral to an intent to cause injury that would result in death." (*People v. Robertson* (2004) 34 Cal.4th 156, 171.) In *Robertson*, we held that the trial court did not err in instructing about second degree felony murder based on a violation of section 246.3 where the defendant claimed he had fired his gun to frighten the men who were stealing his hubcaps. (*Robertson*, at p. 173.) Here, however, there was no evidence that Dearaujo used his gun for any other purpose than to commit a carjacking. We similarly doubt that either second degree murder or voluntary manslaughter were available as lesser included offenses here. We will assume, merely for purpose of argument, that they were.

21

directed two other carjackings by gang members whom he had armed. He had personally carjacked Dale Nonies. On the night of the murder, he told Dearaujo to secure a car and gave him the gun. Defendant specifically said to place the victim in the trunk. He clearly contemplated a robbery, not the mere theft of an unattended vehicle. Defendant intended that the gun be used to commit a carjacking and, if necessary, to shoot the victim. Dearaujo acted on defendant's direction when he approached the car and pointed the gun at Los. Her killing was manifestly a natural and probable consequence of defendant's instructions.

No substantial evidence supports defendant's assertions that he was unaware Dearaujo would use the gun or that he did not share Dearaujo's purpose. No evidence points to a different intent than Dearaujo's use of defendant's gun to commit a carjacking and, if necessary, to shoot a resisting victim. Defendant asserts the jury might have concluded he only intended that Dearaujo obtain a car, not necessarily commit a carjacking. He argues further the jury could have inferred he armed Dearaujo merely for self-defense. There is simply no basis in the evidence for these speculative assertions. As we noted in *People v. Mendoza* (2000) 24 Cal.4th 130, 174, "[s]peculation is insufficient to require the giving of an instruction on a lesser included offense." The fragments of Lyons's testimony on which defendant relies in no way support the instructions he claims were lacking. For example, to bolster his argument that the shooting was a reflexive and impulsive act rather than a calculated plan to kill, defendant asserts that Lyons testified Dearaujo shot the victim in a panic. In the transcript passages he cites, however, Lyons testified not to Dearaujo's panic, but to his own. Again, defendant fails to direct us to any substantial evidence supporting a lesser included instruction.

### 2. *Consciousness of Guilt Instructions (CALJIC Nos. 2.03 & 2.06)*

Defendant challenges the consciousness of guilt instructions regarding false statements and suppression of evidence (CALJIC Nos. 2.03, 2.06 ) as "infirm" under various constitutional provisions. (U.S. Const., 5th, 6th, 8th & 14th Amends.) He urges that they permitted the jury to convict him based on improper inferences and were impermissibly argumentative. He alternatively contends that the instructions were unwarranted by the evidence.

We have consistently rejected the challenges defendant advances here. *People v. Lopez* (2013) 56 Cal.4th 1028, held that neither CALJIC No. 2.03 nor No. 2.06 is argumentative, nor does either generate an impermissible inference of guilt. (*Lopez*, at p. 1075.) *People v. Watkins* (2012) 55 Cal.4th 999, concluded CALJIC No. 2.03 does not direct or compel the drawing of an impermissible inference of guilt. (*Watkins*, at p. 1028; accord, *People v. Stitely* (2005) 35 Cal.4th 514, 555; *People v. Holloway* (2004) 33 Cal.4th 96, 142.) "Each challenged instruction made clear that the jury 'may' consider certain described conduct as a circumstance tending to prove consciousness of guilt, but each also cautioned that such conduct is not sufficient by itself to prove guilt, and that the weight or significance of the conduct, if any, constituted matters for the jury's consideration." (*Watkins,* at p. 1027.) "These conclusions apply with equal force to the case before us and defendant provides no persuasive reason for reconsidering the issue." (*Lopez,* at p. 1075.)

Moreover, there was ample evidentiary support for the instructions. There was evidence defendant made false and misleading statements to police about his involvement in the murder. "[T]he instruction applied based on defendant's inconsistent and contradicted statements to police attempting to minimize involvement in the capital crime." (*People v. Stitely, supra,* 35 Cal.4th at p. 555; *People v. Kelly* (1992) 1 Cal.4th 495, 531.) Similarly, there was evidence

23

defendant subsequently gave the murder weapon to Anthony Post, who then disassembled it.  (See *People v. Hart* (1999) 20 Cal.4th 546, 620-621 [citing cases involving disposal or attempted disposal of weapons].)

### 3. *Jury Query Regarding Liability of Principals for Aiding and Abetting Purposes*

Defendant contends the trial court responded inadequately to a jury inquiry. He asserts the trial court's response violated his rights under various constitutional provisions.  (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., §§ 1, 7, 15, 16 & 17.)  The claim is meritless.

During their deliberations, the jurors sent out two notes regarding aiding and abetting liability.  The first note asked:  "Need clarification of the law —  [¶] If A-B-C-D were involved in planning and talking about a robbery at one place and B + C started out to the do the crime [but] [t]hey did not do the planned crime but did another crime in the same area, what would A's status be under the law." These facts apparently referred to the robbery of the Los Angeles Times distribution center that Dearaujo and Lyons committed after they failed to rob the liquor store as defendant had originally directed.  The trial court responded:  "In response to your Question #9, the legal answer is provided in the instructions already provided.  The court would refer you to the series on Aiding and Abetting, starting with 3.00.   [¶]  Note that in your question, whether "A" would be legally responsible for the actual crime ultimately committed would require that the jury unanimously find that the committed crime was 'reasonably foreseeable.'  That is, an aider and abettor ('A' in your hypothetical) is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonable foreseeable offense committed by the person(s) ('B-C-D' in your hypothetical) he aids and abets."

Later the same day, the court received a second note:  "I want to know if a person is a principal if the non principal commits a crime is the principal just as

24

guilty of the crime also."  In discussing the note, the court agreed with the prosecutor that the answer to the question was covered by CALJIC No. 3.00. Defense counsel said:  "But there are —," at which the prosecutor broke in and said, "That one instruction answers that question."  Defense counsel stated, "Yes, well —," and the prosecutor continued, " — which is to what level are principals responsible.  Each principal, regardless of the extent or manner of participation, is equally guilty, principals included, and its [*sic*] defined."  Defense counsel reiterated an earlier objection he had made to all aiding and abetting instructions, including CALJIC No. 3.00 but acknowledged, "that language is in 3.00."  The trial court said, "Okay.  You objection is noted and the answer is to refer to instruction 3.00."  The judge then responded to the jury's question as follows: "You are referred to Instruction 3.00."

Defendant contends that the trial court's response, referring the jury to CALJIC No. 3.00, was inadequate because it did not also refer to CALJIC No. 8.27.  Additionally, he asserts the response showed partiality by the court toward the prosecution.

The Attorney General argues the claim is forfeited.  The record reveals that during the discussion of the jury's note defendant renewed his objection to all aiding and abetting instructions, including the one to which the court referred the jury, and the court noted the objection.  This is sufficient for us to proceed to the merits of the claim that we reject.

Section 1138 requires the court to answer jury requests for clarification on points of law.[14]  "If, however ' "the original instructions are themselves full and

---

[14]     Section 1138 provides in relevant part:  "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought

*(footnote continued on next page)*

25

complete, the court has discretion under . . . section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." ' " (*People v. Smithey* (1999) 20 Cal.4th 936, 985.)  Defendant does not contend that CALJIC No. 3.00 was an incorrect statement of the law but only that, in addition to that instruction, the trial court should also have referred the jury to CALJIC No. 8.27.

The second note reflects confusion over who qualifies as a principal.  A "non principal" cannot commit a crime because, by definition, one who commits a crime *is* a principal.  CALJIC No. 3.00 explains that concept and clarifies that aiders and abettors may be liable as principals, even if they do not directly commit the offense.  The instruction was sufficient to clarify the jury's inquiry.[15]

CALJIC No. 8.27 simply restates those concepts in the context of the particular offense of felony murder.[16]  CALJIC No. 8.27 was both read to the jury

---

*(footnote continued from previous page)*

into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel . . . ."
[15]      As given here, CALJIC No. 3.00 stated:  "Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime.  Each principal, regardless of the extent or manner of participation is equally guilty.  [¶]  Principals include, one, those who directly and actively commit or attempt to commit the crime, or, two, those who aid and abet the commission or attempted commission of the crime."
[16]      As given here, CALJIC No. 8.27 stated:  "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery, all persons who either directly or actively commit the act constituting the crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage or instigate by acts or advice its commission, are guilty of murder of the first degree whether the killing is intentional, unintentional or accidental."

26

and given to it in writing. The jury received additional instructions in aiding and abetting as well as the elements of robbery and other substantive offenses. Defendant fails to demonstrate error.

Defendant also argues that in exercising its discretion the court demonstrated partiality to the prosecution. He fails to explain how giving a correct statement of the law, particularly in the absence of a request for augmentation, reflects partiality.

### 4. Instruction on Natural and Probable Consequences (CALJIC No. 3.02)

There are two distinct forms of aider and abettor liability. "First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) This latter form of liability was the basis of the prosecutor's theory that defendant aided and abetted the Los murder: he aided and abetted Dearaujo's carjacking, the natural and probable consequence of which was that Dearaujo shot and killed Los.

The prosecution's theory was explained in CALJIC No. 3.02, given here: "One who aids and abets another in the commission of a crime is not only guilty of those crimes, but is also guilty of any other crimes committed by a principal which is a natural and probable consequence of the crime originally aided and abetted." The jury was told that before it could convict defendant it had to find "beyond a reasonable doubt that: [¶] 1. The crime . . . of . . . murder [was] committed; [¶] 2. That the defendant aided and abetted [that] crime[]; [¶] 3. That a co-principal in that crime committed the crime[] of . . . murder[;] and [¶] 4. The crime[]

27

of . . . murder [was] a natural and probable consequence of the commission of the crime[] of robbery."

Defendant contends the natural and probable consequences doctrine as set forth in CALJIC No. 3.02 unconstitutionally imposes criminal liability for mere negligence. ( U.S. Const., 5th, 6th, 8th & 11th Amends.) We have previously rejected similar challenges. (*People v. Richardson* (2008) 43 Cal.4th 959, 1021; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 108), and do so again.

Alternatively, defendant faults the trial court for omitting the following language from the version it gave of CALJIC No. 3.02: "In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen."

Defendant was tried in 1998. The "objective test" language was added to the instruction by a 2000 revision. (CALJIC No. 3.02 (2000 rev.) (6th ed. 1997).) The trial court's instruction was a complete and accurate statement of the law. There was no error. Defendant fails to demonstrate that the failure to include a clarification later included by the CALJIC committee rendered the instruction inadequate as given.[17] To the extent defendant could have sought a modification of the instruction to add the "objective test" language, his failure to have done so

---

[17]     The instruction given at defendant's trial was prepared by the Committee on Standard Jury Instructions, Criminal, composed of lawyers and judges under the auspices of the Los Angeles County Superior Court.

28

forfeits any claim of error. (*People v. Lang* (1989) 49 Cal.3d 991, 1024 ["A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party requested appropriate clarifying or amplifying language"].)

### D. Trial Court Responses to Jury's Requests for Clarification Regarding Law of Conspiracy

Conspiracy, like aiding and abetting, was presented as a theory of defendant's liability, but was not charged as a substantive offense. "It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator." (*People v. Belmontes* (1988) 45 Cal.3d 744, 788.)

Over defendant's objection, the jury was given standard conspiracy instructions, including CALJIC No. 6.10.5, which defined the conspiracy as "an agreement between two or more persons with the specific intent to agree to commit the crime of robbery, and with the further specific intent to commit that crime, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement." The jury was also instructed it "must determine whether the defendant is guilty as a member of the conspiracy to commit the originally agreed upon crime or crimes, and, if so, whether the crime alleged in Counts I through XI was perpetrated by a co-conspirator in furtherance of that conspiracy and was a natural and probable consequence of the agreed upon criminal objective of that conspiracy." Additionally, the jury was instructed that "[e]ach defendant is individually entitled to, and must receive, your determination whether he was a member of the alleged conspiracy."

During deliberations, the jury sent a note to the trial court: "When you deal with conspiracies, is every individual crime the start of a new conspiracy or does

29

the conspiracy start at the first crime and every crime after that is just a continuance of the original conspiracy." The jury's note did not refer to a particular instruction or count as the impetus for the question.

The trial court, over defendant's objection, responded: "You, the jury, are to determine from the evidence whether a conspiracy was formed. If you find that a conspiracy was formed, then any crimes committed which you find to be in furtherance of that conspiracy comes within the original conspiracy. All of these legal concepts are included in the instructions previously given starting with 6.10.5."

Defendant contends the trial court's response was error because, he asserts, whether there was a single conspiracy or multiple conspiracies was a factual question for the jury to decide and the trial court's response "implied (if not directed)" there was a single conspiracy. According to defendant, "[i]f the jury had been permitted to decide for itself whether there was but one conspiracy or a number of conspiracies, the jury may well have decided the individual conspiracies were narrow in scope – a result likely in [defendant's] favor."

The Attorney General argues defendant has forfeited his claim on appeal because defense counsel failed to specifically object to the trial court's response. During the discussion of the note, defense counsel reiterated his objection to any conspiracy instructions because the substantive offense of conspiracy had not been charged. Moreover, defense counsel specifically objected when the court proposed telling the jury "if you find that a conspiracy was established, then any crime committed that is in the furtherance of that conspiracy comes within the perimeters of that conspiracy." Although defense counsel grudgingly conceded the ultimate response given by the court did not contain "any blatant problems," he again noted his objection to any conspiracy instructions. We assume these

30

objections were sufficient to preserve the issue on appeal. The claim fails on its merits.

Defendant cites decisions of the Court of Appeal for the proposition that the number of conspiracies is a factual question for the jury. As he concedes, however, the lower court is split on this question. (Compare *People v. Jasso* (2006) 142 Cal.App.4th 1213 with *People v. Liu* (1996) 46 Cal.App.4th 1119, 1133.) Moreover, these decisions involved conspiracy as a charged offense. Where the crime of conspiracy is charged, the factual question of whether there was a single conspiracy or multiple conspiracies raises questions of jury unanimity and whether the evidence will sustain single or multiple convictions. (See, e.g., *Jasso,* at pp. 1220-1223.) Where, however, conspiracy is a theory of liability and not a charged offense, these considerations do not arise. We need not resolve that conflict in the different context of this case.

We disagree with defendant's assertion that the trial court's response to the question directed the jury to find that only one conspiracy existed. To the contrary, the reference to "a conspiracy" in the first two sentences of the response would not have foreclosed the jury from determining there were multiple conspiracies. Also significant was the trial court's reference in the third sentence to the conspiracy instructions previously given. As noted, those instructions informed the jury it must determine whether defendant was a member of a conspiracy for purposes of counts 1 through 11. These instructions allowed the jury to consider whether there was a single conspiracy encompassing all counts or whether each count was the fruit of its own conspiracy. In short, the trial court's response did not remove from the jury its ability to determine for itself whether there was one conspiracy or multiple conspiracies.

Further, it would have made no difference even if some jurors understood the court's response in the manner claimed by defendant. Even were we to

31

assume the jury understood the note in the manner defendant urges, any error would have been harmless.[18]  There was overwhelming evidence that defendant either actively participated in or instigated every crime committed by the Pimp-Style Hustlers.  Whether the jurors concluded there was single conspiracy encompassing multiple counts or that each count constituted a separate conspiracy, the result would have been the same.  There is no reasonable probability of a more favorable verdict had the jury been explicitly instructed that it was to determine the number of conspiracies.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.) [19]

---

[18]  Although defendant appears to argue there is a federal constitutional dimension to his claim of error, he neglects to identify the precise constitutional right involved or the manner in which it may have been violated.  He simply asserts he would have benefited had the jury determined there were multiple conspiracies, without showing how.  Accordingly, the error appears to be one of state law only.  Even if we were to subject the claimed error to review under the standard for federal constitutional error, we would find it harmless beyond a reasonable doubt.  (See *Chapman v. California* (1967) 386 U.S. 18; *People v. Harris* (1994) 9 Cal.4th 407, 424-431.)

[19]  Defendant raises a somewhat related claim.  He asserts that, assuming the jury concluded there was a single conspiracy, the Circle K robbery could not have been part of it because it occurred before the formation of his gang. He shows no prejudice.  The jury was instructed it had to decide whether the various counts were in furtherance of the conspiracy.  Assuming the jury found the conspiracy began when defendant formed the gang, an offense committed beforehand could not have been in furtherance of the conspiracy.  More fundamentally, there was ample evidence defendant aided and abetted the Circle K robbery.

Defendant also argues that, because the purpose of the Pimp-Style Hustlers conspiracy was to obtain money, the murder of Los, to obtain a car, was not in furtherance of the conspiracy.  It is unclear how this relates to his overall argument.  In any event it is without merit.  The evidence amply showed defendant, Dearaujo and Lyons conspired to commit a carjacking and that the murder was a natural and probable consequence of the target offense.  Their ultimate goal, whether to obtain money or transportation or both, is irrelevant.  They intended to commit a carjacking.  That offense was identified by defendant as one of the gang's chosen crimes.  Whether they ultimately intended to establish a fleet of stolen cars for the gang's use or to liquidate the stolen cars for ready

*(footnote continued on next page)*

Finally, defendant contends "[t]he jury should have been instructed to agree unanimously whether there was a single or multiple conspiracies." We have previously rejected that argument when a count of conspiracy has not been charged but the doctrine is merely relied upon as a theory of culpability for the crimes for which the defendant is on trial. (*People v. Valdez* (2012) 55 Cal.4th 82, 153-154; *People v. Prieto* (2003) 30 Cal.4th 226, 251.)

### E. Excusal of Juror No. 10 During Deliberations

Defendant asserts Juror No. 10 was improperly dismissed during deliberations, violating his rights under various federal constitutional provisions. (U.S. Const., 5th, 6th & 14th Amends.) The claim fails.

### 1. Background

During deliberations the court and counsel met with Juror No. 10, at her request. The juror's driver's license was suspended. She wanted to know if jury duty counted as community service because she otherwise feared she would be unable to drive to court. The court advised her to take it up with the traffic court. On her way out, the juror asked, "What is not deliberating? If you don't have comments, is that considered not deliberating?" The court replied: "Not deliberating is just what it sounds like. A person just sits there with their, figuratively with their arms closed, and they just don't discuss the case or the law with other jurors. It's like they have pulled away and they won't talk about it period." After the juror left, the prosecutor expressed some concern with the trial

---

*(footnote continued from previous page)*

capital does not negate their intent to commit a carjacking, or remove that crime from the scope of their conspiracy.

court's answer. The court recalled the juror to correct any misimpression. The court said, "[T]he appropriate response should have been that if the jury has a question regarding the subject, the foreperson should direct a note to the Court in this regard and then the Court would address to the jury as a whole the subject . . . rather than an individual going back and saying, well, the Court told me such and such, which would be improper."

Three days later, on the tenth day of deliberation, Juror No. 10 called in sick. When contacted by the court clerk about whether she would appear the next day, Juror No. 10 said she would call in that afternoon. Later, she telephoned to say she would probably not be in the next day. The bailiff, meanwhile, reported that the other jurors wanted to talk to the court about Juror No. 10's absence. The jurors appeared to be quite agitated. After some discussion with counsel, the trial court directed the foreman to send a note about the jury's concerns.

In response, the foreman wrote: "Regarding juror number 10[.] She does not pay attention to discussion, she appears to be asleep most of the time, doesn't participate [,] constantly has an attitude towards others. [¶] Furthermore, we've completed the written voting on counts 1-11. She has been seen writting [*sic*] information on paper [and] taking it out with her to lunch. When she returns from lunch she changes her opinion on how she voted and has questions on the legal terminology. This has happened <u>more </u>than once. Upon her return from lunch she mentioned at the table that 'my lawyer can put holes on this interview.' [¶] She has also stated that she wants to prolong this due to the fact that she doesn't want to return to work. This unnecessary delay has caused financial hardship on juror number 11. [¶] There is a number of issues that other jurors would like to discuss with you. Sorry for the inconvenience. [¶] Juror #3 4/1/98."

34

The prosecutor argued that the note showed misconduct and suggested that the court talk to the foreman and then to Juror No. 10 the following day. Defense counsel agreed.

The foreman, Juror No. 3, told the court the jury's procedure was to go around the table so each juror could speak. He reported that, while other people spoke, Juror No. 10 had her eyes closed. When it came her turn to speak, she would announce she had nothing to say. When asked by the court if Juror No. 10 was asleep, Juror No. 3 responded that she would ask questions about subjects they had just finished discussing. Juror No. 3 said, while he had never seen it, other jurors reported that Juror No. 10 made notes to herself and, when she returned from lunch, would want to revisit counts she had already voted on and would bring up technical questions. When Juror No. 3 would ask her to write down her thoughts so other jurors could discuss them, she would "clam[] up." He reported that "[w]hen she disagrees, we try to find out why she disagrees and she won't tell us . . . . She just says my opinion is this and that's it." He also reported that Juror No. 10 said she wanted the trial to go on as long as possible. Other jurors believed it was because she did not want to go back to work and perhaps intended to file a "stress case" with her employer.

Under questioning by the prosecutor, Juror No. 3 reiterated that attempts by other jurors to solicit Juror No. 10's reasons for her positions were met with statements like, " 'Because I believe, because this is the way I believe,' but she doesn't give a reason why she believes that." Juror No. 3 said in his opinion, Juror No. 10 was not deliberating because "she does not accept our views at all. She's closed her mind. If we break it down step by step, she does not open her mind to anything we say." Juror No. 3 also clarified that Juror No. 10's statement that her "lawyer can put holes in this interview" referred to the police interrogation of defendant. He ended by telling the court, "we're all just so frustrated [with Juror

35

No. 10] we don't know where to go," and described their stress — "A lot of us aren't getting any sleep . . . stomachs are inside out, upside down. I'm shaking right now."

Defense counsel asked whether the other jurors' frustration was only with Juror No. 10. Juror No. 3 responded that while everyone had feelings about the case, they were trying to follow the law. He said the "race issue" had been brought up and, as the foreman, "I tried to put a halt to that right then and there, and I think I did, but that came up and we sort of talked about it. [¶] We don't look at it that way. I mean, we are looking at the law." Nonetheless he believed that Juror No. 10 may have taken that discussion personally. Juror No. 3 said there had also been a "blowup" in the room but that he had apologized for it.[20]

The court and counsel then questioned six other jurors (Juror Nos. 1, 2, 4, 5, 6 and 11) on four specific points: (1) whether Juror No. 10 was sleeping during deliberations; (2) Juror No. 10's statements about prolonging deliberations to avoid going back to work; (3) whether Juror No. 10 consulted outside sources on the law; and (4) whether Juror No. 10 refused to deliberate.

On the first point, Juror No. 2 stated he had seen Juror No. 10 sleeping during deliberations. The remaining jurors could not say she was sleeping but all of them had seen her with her eyes closed for several minutes during which she did not appear to be paying attention to the discussion. One juror mentioned Juror No. 10 had fallen asleep during the trial court's instructions.

On the second point, Juror Nos. 2 and 6 reported that Juror No. 10 had said she wanted to prolong the deliberations and that she did not want to return to

---

[20] Neither the court nor counsel questioned the foreperson further about the nature of the "blowup" or whether it related to the "race issue." No additional information on this topic appears in the record. (But see fn. 21, p. 38, *post*.)

36

work.  The other jurors had not heard her make this statement although Juror No. 11 had heard from other jurors that Juror No. 10 had made the statement.

On the third point, all the jurors told the court they saw Juror No. 10 making notes on scraps of paper she would take with her during lunch breaks.  She would return from lunch and change her position on issues the jury had voted on earlier.  She would present new arguments, sometimes introducing new legal terms.  Several of the jurors remembered her statement that her lawyer could poke holes through defendant's statement to police.  Juror No. 2 noted that Juror No. 10 had an appointment with a lawyer involving custody issues.

On the final point, the jurors said Juror No. 10 regularly refused requests to explain her position and to relate it to the law and evidence.  For example, Juror No. 1 said Juror No. 10 would say whether she liked or disliked something but would not go into detail and would not discuss the factual or legal basis of her opinion.  Juror No. 2 said her response when asked to explain her position was, "When I'm ready to tell you, you'll find out.  When I'm ready to say something, you'll hear from me."  Juror No. 2 said Juror No. 10 had been offered the option of writing down her disagreements for discussion and had refused.  Juror No. 2 also spoke of an incident where Juror No. 10 said, "I'm the only African/American in this room and I want to make sure, I have to double check everything."  He said, "she felt that she was being picked on because of that, and I said, no, you know, that's not the issue, and so everybody, everybody has been very, very patient with her since she made that statement."[21]

---

[21]    It is not clear whether this is the same episode the foreman was referring to when he mentioned the "race issue." Defendant suggests that the juror's removal was race related because both Juror Nos. 12 and 10 were African-American and their removal left no African-Americans on his jury.  Defendant is African-American.  He suggests that the other jurors may have wanted to remove these

*(footnote continued on next page)*

Juror No. 4 said that during discussions Juror No. 10 would flip through the pages of the instructions, and "not [be] with us." She disagreed without stating why, and said the other jurors had not proven their positions. When they offered specifics, Juror No. 10 would say, " 'No, I don't believe it.' " Juror No. 4 said the other jurors had "bent over backward" to allow her to say everything she wanted to say and had provided her with her own set of instructions while they shared another among themselves. Juror No. 5 said if there was a disagreement between Juror No. 10 and other jurors, she would not explain the basis of her disagreement "so we could help understand where she was coming from." Juror No. 6 told the court that Juror No. 10 would "refuse to speak with us. She will just say, 'I'm not talking to you, if I have something to say, I'll say it.' " Juror No. 6 added that, on issues on which she agreed with other jurors, she was more open but where she disagreed she would not discuss the basis of her disagreement. Juror No. 11 said Juror No. 10 would participate in discussions during the morning sessions but then "clam[] up" in the afternoon. When the jurors went around the table to speak and

_(footnote continued from previous page)_

jurors because of their race. The record lends no support to this claim. The dismissals of the two jurors came at different points in the trial and for different reasons, neither related to race. The only mention of race in the jury room, of which there is any evidence, is the episode described above in which Juror No. 10 asserted that because she was African-American she had to "double check everything." The juror's life experience as an African-American was certainly a legitimate prism through which she viewed the case but, as her fellow jurors correctly pointed out, race was not an issue here. Moreover, defendant assumes the remaining jurors were White. Other than Juror No. 10's assertion, the record does not reflect the racial composition of the jury. We do know, from statements by the jurors to the court, that they tried to include Juror No. 10 in the deliberations and to draw her out. We reject as unsupported defendant's insinuation that racial bias played a role in Juror No. 10's dismissal or in the jury's ultimate resolution of the case.

it was Juror No. 10's turn to speak, she would say, " 'I ain't got nothing to say,' and that would be it."

After hearing from seven out of the 12 jurors, the trial court stated, "it seems like we are hearing the same things over and over again." The clerk reported that Juror No. 10 had indicated she would probably not be back the following day. The court concluded there was credible evidence from the statements of her fellow jurors that Juror No. 10 was sleeping during deliberations. The court noted that "on many occasions" during the trial it had to send the bailiff over to "wake her up, give her cups of water." The court pointed to one example when the tape of defendant's interrogation was being played and the jury followed along with transcripts. "[S]he would go as long as five pages without turning the transcript and then all of a sudden would kind of start, come awake, and turn several pages at once and then repeat the process." Based on these observations and the statements of her fellow jurors, the court said, "it is probable . . . that she does have a problem staying awake."

The court did not find there was sufficient evidence to conclude either that Juror No. 10 wished to prolong the proceedings or was receiving information from outside sources.

The court concluded it was "very clear" that Juror No. 10 had "violate[d] her jury oath by not deliberating." The court stated, "You can't take a position and refuse to discuss the basis for it," and found "a consistent pattern where . . . if it's a situation where she is in disagreement with other jurors, simply takes the position and then stonewalls."

Finally, the court cited "her inability to participate because of [her] illness." The court alluded to the fact that the jury had been given "a certain time line" for the trial that Juror No. 10's illness was disrupting. He noted that, given the flu-

39

like symptoms she had described, she might be contagious.  Accordingly, the trial court excused her.

Defense counsel objected to the dismissal.  He argued it was unclear whether Juror No. 10's unwillingness to express her opinion was on minor or important issues.  He argued further if she had already made her point and did not wish to restate it declining to do so did not constitute a refusal to deliberate. The court clarified that it found the areas of disagreement to be on important issues and that, while there were instances when Juror No. 10 did discuss evidence, "it's pretty clear that the norm is that she has a predisposition not to deliberate."

The court excused Juror No. 10 and the clerk so informed her. Nonetheless, Juror No. 10 appeared the next day and accused her fellow jurors of not beginning deliberations anew when previous jurors had been excused.   She reported she was taking antibiotic and pain medicine for an ear infection and was "like drugged, dragging."  Her statements regarding renewed deliberations are discussed below.

### 2.  *Discussion*

The trial court may discharge a juror for good cause at any time, including during deliberations, if the court finds that the juror is "unable to perform his or her duty."  (§ 1089.)  As noted, "[w]e review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold the decision if the record supports the juror's disqualification as a demonstrable reality."  (*People v. Wilson, supra,* 43 Cal.4th at p. 26.)  The trial court gave three reasons for excusing Juror No. 10:  (1) she was sleeping during deliberations; (2) she violated her oath by refusing to deliberate; and (3) her illness would delay the proceedings indefinitely.  Because the first reason is sufficient to uphold the court's ruling, it is

40

unnecessary for us to address the court's remaining grounds. (*People v. Johnson* (1993) 6 Cal.4th 1, 21-22.)

Sleeping during trial constitutes good cause for the dismissal of a juror. (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.) "When the trial court receives notices that such cause may exist it has an affirmative obligation to investigate. [Citations.] Both the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court." (*Ibid.)*

In *People v. Johnson, supra,* 6 Cal.4th 1, the trial court excused a juror after finding the juror had fallen asleep at trial. "The court, its two deputies, and the prosecutor each stated on the record that they had observed [the juror] exhibiting various physical indicia of sleep, including eye closures, head nodding, and slumping in his chair." (*Id.* at p. 21.) We concluded the trial court had properly discharged the juror, notwithstanding the defendant's claim that the court had not inquired of the juror whether he had been asleep. (*Id*. at pp. 21-22.)

In *People v. Ramirez* (2006) 39 Cal.4th 398, the court excused a juror over the defendant's objection after receiving a note from the foreperson "that the juror had fallen asleep on two occasions." (*Id*. at p. 456.) The court questioned the foreperson who confirmed that he had seen the juror sleeping. The court added that it had noticed the juror " 'behaving as if he were dozing off from time to time.' " (*Id.* at p. 457.) Based on the foreperson's statements and the court's own observations, the court excused the juror for sleeping. We affirmed: "The judge's observations were consistent with the testimony of the jury foreperson that the juror had fallen asleep twice during deliberations. The trial court, therefore, did not abuse its discretion in discharging the juror." (*Id.* at p. 458.)

Here, the record is more extensive than in *Johnson* and *Ramirez*. Juror No. 2 affirmatively stated that he had seen Juror No. 10 sleeping during deliberations,

41

adding that he sat "two seats away from her, so I can see her very clearly." Five other jurors described behavior consistent with sleeping. The juror closed her eyes and leaned back in her chair, once for at least 15 minutes. She would later appear to have no idea what the other jurors had been discussing while she was in this posture. One of the jurors reported Juror No. 10 slept during instructions. To this testimony, the court added its own observations that "on many occasions" it had to have the bailiff wake her and bring her water. The court referred to a specific instance while the jury listened to the recording of defendant's statement to the police. This record reveals no abuse of discretion in excusing the juror for sleeping.

## F. Alleged Coercion of Verdict

Defendant contends that the verdict reached following the dismissal of Juror No. 10 was the product of coercion, violating his rights under various constitutional provisions. (U.S. Const., 5th, 6th, 8th & 14th Amends.) His claim can also be understood to assert that the jury failed to deliberate anew as instructed. In either case, he cites allegations of juror misconduct made by Juror No. 10 regarding deliberations after previous jurors had been dismissed and the speed with which the jury reached its verdict after Juror No. 10 was excused. We consider and reject both aspects of his challenge.

### 1. Background

Juror No. 10 was excused from the jury on Wednesday, April 1, and notified of her excusal that afternoon. The next morning, Thursday, April 2, Juror No. 10 appeared in court and accused her fellow jurors of not beginning deliberations anew when two alternates had been seated. According to Juror No. 10, the remaining jurors asked the newcomers what they thought and told them what the previous group had decided. She elaborated: "[W]e spent a week and a

42

half in there before we could even vote on issues, and then you come in and you just say how you felt about certain charges, and then we listened and we said that's how we felt, and then we voted." She also said the jury had voted on 11 charges before the alternates were seated.[22] After Juror No. 10 left the courtroom, defense counsel indicated he would seek a mistrial because the jury failed to deliberate anew. The court said it would consider the motion when it was filed, but pointed out "starting anew does not necessarily mean that the jury is required to repeat every step and every word and every nuance of [its] deliberations, including asking for the same testimony to be reread or the same words to be spoken or things of that nature."

Following that discussion, the court convened the jury and Juror No. 10's replacement, Alternate Juror No. 4. The court read CALJIC No. 17.51, which admonished the jury not to consider for any purpose the replacement of Juror No. 10 and to "set aside and disregard all past deliberations and begin deliberating anew. This means that each remaining original juror must set aside and disregard the earlier deliberations as if they had not taken place."

The reconstituted jury began deliberations at 10:30 a.m. on Thursday, April 2 and adjourned at 4:10 p.m. During that time, it requested that portions of Mondre Weatherspoon's testimony be read back. They agreed on verdicts for nine of the 11 counts. The jury did not deliberate on Friday, April 3. The following Monday, April 6, deliberations resumed at 9:30 a.m. That afternoon, the jury sent a note requesting clarification of the phrase "to wit" in an instruction concerning

---

**22**     Those votes were not formally returned as verdicts. Final verdicts on all counts were returned only after Juror No. 10 was excused and a third alternate seated.

43

sentence enhancements. At 2:15 p.m., the jury reached verdicts on the remaining two counts.

Defendant's mistrial motion was heard after the verdicts were recorded but before the penalty phase began. The trial court rejected the idea that CALJIC No. 17.51 required the jury to backtrack and duplicate every discussion it had had before the new jurors were seated. "It means in good faith they start from the beginning discussing issues and show a willingness to include the newly seated juror or jurors so that all decisions are made with all 12 jurors participating in that function." The court noted that, between the time the two alternates were seated and Juror No. 10 made her allegations, the jury had requested readbacks and submitted a question. "[S]o I am satisfied that they were deliberating within the legal meaning of Section 17.51; therefore, the motion for mistrial is denied."

## 2. *Discussion*

There is no merit to defendant's claim that the reconstituted jury was coerced into reaching a verdict or that it failed to deliberate anew. "We presume [it] followed the trial court's instructions to begin the deliberation anew [citation], and defendant's speculation to the contrary does not persuade us to conclude otherwise." (*People v. Fuiva* (2012) 53 Cal.4th 622, 716.) Here, that presumption is supported by the actual, deliberative conduct of the reconstituted jury. It requested a readback and asked the court for clarification of instructions. Defendant asserts the length of deliberations is evidence the jury did not follow the instruction to begin deliberations anew. "But the brevity of the deliberations proves nothing. [Citations.] The newly constituted jury was not required to deliberate for the same length of time as the original jury, nor was it required to review the same evidence. When, as here, there are no indications to the contrary, we assume that the jurors followed the trial court's instructions and started afresh.

44

[Citation.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1413.)  Defendant's further claim that the trial court's excusal of Juror Nos. 10 and 12 communicated to the jury the court's view that defendant was guilty is meritless.  The two jurors were excused at different points in the trial and for different reasons.  Nothing said by the court on either occasion communicated any court opinion as to defendant's guilt or innocence.

Defendant asserts that Juror No. 10's accusations of misconduct are evidence that the jury refused to deliberate anew.  We assume, without deciding, her statements were admissible under Evidence Code section 1150, subdivision (a).[23]  Plainly, the trial court rejected the former juror's implicit belief that redeliberation required repetition of every step taken to the point when the new jurors were seated.  Thus, contrary to defendant's claim, the trial court was not obliged to instruct the jury to discontinue engaging in the "improper practices" asserted by Juror No. 10.  Moreover, Juror No. 10 obviously was not present during the deliberations of the jury that actually rendered the verdicts.  Finally, to the extent defendant faults the court for failing to conduct a more thorough investigation, the contention is forfeited by his failure to raise it below.  In any event, the trial court acted within its discretion as to the scope of any such investigation.  (*People v. Alexander* (2010) 49 Cal.4th 846, 927.)

---

[23]    That statute provides:  "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such character as is likely to have influenced the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent or to dissent from the verdict or concerning the mental processes by which it was determined."  (Evid. Code, § 1150, subd. (a).)

## G. Sufficiency of Evidence to Support Robbery-Murder Special Circumstance

Defendant contends insufficient evidence supported the robbery-murder special circumstance based on an aiding and abetting theory. According to defendant, the evidence failed to establish he was a major participant in the target offense or exhibited reckless indifference to human life as required by section 190.2, subdivision (d).

In considering such a challenge " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 514-515.) "The same standard applies to special circumstance allegations." (*People v. Tully* (2012) 54 Cal.4th 952, 1007.)

At the time of defendant's trial, section 190.2, subdivision (d) stated in relevant part: "[E]very person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids [and] abets . . . in the commission of a felony enumerated in paragraph (17) of subdivision (a) which felony results in the death of some person or persons, who is found guilty of murder in the first degree therefor, shall suffer death or confinement in state prison for life without the possibility of parole, in any case in which a special circumstance enumerated in paragraph (17) of subdivision (a) . . . has been found to be true . . . ." Robbery is one of the enumerated felonies. (§ 190.1,

subd. (a)(17)(A).) A major participant need not be the ringleader (*People v. Proby* (1998) 60 Cal.App.4th 922, 931), but a ringleader is a major participant (see *People v. Marshall* (1990) 50 Cal.3d 907, 938). " '[R]eckless indifference to human life' is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death." (*People v. Estrada* (1995) 11 Cal.4th 568, 577; see, for further discussion, *People v. Banks* (2015) 61 Cal.4th 788.)

As he does in other contexts, defendant continues to insist that his only participation in the murder was supplying the gun and that he had no idea Dearaujo and Lyons would commit a carjacking or kill a resisting victim. His interpretation of evidence is contrary to the governing standard of review and the proven facts.

Defendant was the founder, ringerleader and mastermind behind the Pimp-Style Hustlers. He formed the gang the day after he, Dearaujo and Weatherspoon committed a robbery during which Dearaujo used defendant's gun. The gang's purpose was to commit robbery and carjacking in order to buy a home and build a stock portfolio. Defendant gave the gang members a carjacking tutorial and instructed them that a resisting victim was to be shot.

Defendant directed the attempted carjacking of Phillips and Nolin and that of DeGeorge. He personally robbed Nonies and tried to carjack Brodbeck. Defendant also ordered Dearaujo and Lyons to rob a liquor store, which led to the robbery at the Los Angeles Times distribution center. In each case, defendant chose and armed the gang member he commissioned to commit the crime or was himself armed with the gun.

The circumstances of the murder followed the pattern of the crimes that preceded and followed it. Defendant directed Dearaujo to go to the Family Fitness Center and to carjack a specific type of car, which he described in detail. He gave

Dearaujo the gun along with a bandana to cover his face. He described where they should meet after the crime. He reminded Dearaujo to put the victim in the trunk. Defendant himself told police he understood that Dearaujo was "gonna jack a car" and that he had repeatedly instructed gang members to shoot a victim who resisted. Defendant later commended Dearaujo and Lyons and awarded them stripes for the murder. His claim of tangential involvement and ignorance are manifestly at odds with the evidence arrayed against him. The facts adduced are more than sufficient to uphold the special circumstance finding that defendant was a major participant and acted with reckless indifference to human life.

## III. PENALTY PHASE ISSUES

### A. Defense Counsel's Asserted Conflict of Interest

Defendant contends his public defender had a conflict of interest because his office had previously represented prosecution witnesses who appeared at the penalty phase. He asserts the conflict violated his rights under various constitutional provisions. (U.S. Const., 5th, 6th & 14th Amends.; Cal. Const., art. I, § 15.) We reject the claim.

#### 1. Background

After Donald Deloney testified about violent activities he and defendant had engaged in while in jail, a representative from the public defender's office, Floyd Zagorsky, requested an in camera hearing to discuss a possible conflict of interest.[24] Zagorsky related that the office had previously represented Deloney. That prior representation created a conflict of interest because Zargorsky believed

---

[24] Zagorsky is identified in the record only as a member of the public defender's office making a special appearance on defendant's behalf. No further explanation is given about why he, rather than defendant's trial counsel, also a public defender, brought this conflict to the court's attention.

48

there was material in Deloney's files potentially useful for his cross-examination. Later, Zagorsky reported his office had represented three other prosecution witnesses — David Ramirez, Christopher Willis and Timothy Goodfield. Zagorsky eventually said he believed there was also a conflict as to four additional prosecution witnesses; Arturo Alatorre, Dale Foster, Michael Hanna and Martin Sanchez, all of whom had been represented by the public defender's office. Defendant's counsel, Deputy Public Defender Wright, informed the court he had not represented any of these witnesses and did not have any confidential information about them. Specifically addressing Deloney, Wright argued he did not have an actual conflict of interest just because another public defender had represented Deloney. Zargorsky took the position that an actual conflict existed when anyone in the public defender's office reviewed the files of former clients and declared a conflict. The trial court did not find a conflict of interest. [25]

### 2. Discussion

To successfully establish a conflict of interest, "defendant must show the existence of an actual or potential conflict 'that adversely affected counsel's performance.' [Citations.] A conflict of interest may arise if counsel's former client is a prosecution witness in the case against the defendant. [Citations.] This is because counsel's duty not to reveal confidential information acquired during the attorney-client relationship creates conflicting obligations to multiple clients that 'effectively seal[s] his lips on crucial matters.' [Citation.] As we recognized in *People v. Cox* (2003) 30 Cal.4th 916, 949, however, courts have held that no

---

[25]    The court ordered Wright not to examine his office's files on the prosecution witnesses for impeachment material but did not preclude him from developing such material from his own independent investigation.

49

actual or potential conflict of interest arises when the attorney does not possess such confidential information." (*People v. Clark* (2011) 52 Cal.4th 856, 983-984.)

Here, Deputy Public Defender Wright told the court he had not represented, nor did he possess, any confidential information about the prosecution witnesses in question. "[Wright], as an officer of the court, was in the best position to assess whether a conflict of interest existed or was likely to arise." (*People v. Clark* (1993) 5 Cal.4th 950, 1001.) "[T]he court may rely on the representations of defense counsel that no conflict exists." (*People v. Lawley* (2002) 27 Cal.4th 102, 146.)

Notwithstanding Wright's representations, defendant insists an actual conflict existed because Zagorsky had declared one based on information in client files. An analogous argument was made in *People v. Clark, supra,* 52 Cal.4th 856. There, Deputy Public Defender Martinez conceded she had not personally represented a prosecution witness previously represented by her office, nor had she obtained information developed by another public defender during the attorney-client relationship. Nonetheless, she declared a conflict. The defendant in *Clark* argued that her declaration distinguished the case from earlier cases like *Lawley* in which no conflict had been declared. We rejected the claim. "That Martinez declared a conflict is not dispositive of its existence, however." (*Clark*, at p. 984.) Given Martinez's concessions, we concluded, based on the totality of the circumstances, that there was "no showing of an actual or potential conflict of interest [here]." (*Ibid.*) Similarly, there is no showing of an actual or potential conflict of interest in this case, Zagorsky's statement notwithstanding.

In a related claim, defendant suggests that the prosecution withheld impeachment evidence about Deloney and other penalty phase prosecution witnesses. (*Brady v. Maryland* (1963) 373 U.S. 83.) Not only is the claim forfeited because it was not made below, nothing in the record supports the

existence of any undisclosed impeachment evidence known to the prosecution. The claim fails as it is based on pure speculation.

### B.  Victim Impact Evidence Claims

Defendant challenges the victim impact evidence as irrelevant and prejudicial and asserts its admission violated his rights under various constitutional provisions.  (U.S. Const., 5th, 6th, 8th & 14th Amends.)  He contends further that the trial court erred by failing to give sua sponte a limiting instruction on the use of the victim impact evidence.  Many of defendant's specific claims, including his claim of instructional error, are forfeited.  All are without merit.

" 'The Eighth Amendment does not prohibit the admission of evidence showing how a defendant's crimes directly impacted the victim's family, friends, and the community as a whole, unless such evidence is "so unduly prejudicial" that it results in a trial that is "fundamentally unfair."  [Citations.]  Likewise, under state law, victim impact evidence is admissible as a circumstance of the crime under section 190.3, factor (a), so long as it "is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case."  [Citations.]' "  (*People v. Pearson* (2013) 56 Cal.4th 393, 466-467.) " '[T]he state has a legitimate interest in " 'counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to [her] family.' " ' "  (*People v. Linton, supra,* 56 Cal.4th at p. 1203.)

Defendant objects to the quantity, scope and nature of the victim impact testimony, asserting that the 10 victim impact witnesses consumed a fifth of the prosecution's penalty phase case.  He objected, however, only to the testimony of three of those witnesses, Los's fiancé, Paul Petrosky and her coworkers

Christopher Reusch and Captain Margaret Foltz. He also objected to admission of a video of the dormitory dedication in the victim's honor, and another depicting a series of still photographs of the victim set to music. The trial court admitted both tapes but directed that the music accompanying the second be muted to avoid evocation of an emotional response. The court also properly allowed the prosecution to call the three nonfamily member witnesses to whom defendant objected. Victim impact testimony is not limited to testimony of family members. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183.) Defendant did not object to the testimony of the victim's family members or her former husband. His claims regarding their testimony are forfeited. (Evid. Code, §353; *Pollock,* at p. 1183.) Defendant asserts any objection would have been futile in view of the trial court's admission of other testimony and videos. The argument fails. The trial court carefully listened to defendant's objections, modifying one exhibit by excluding the music. We will not assume the trial court would have been any less conscientious had defendant timely objected to the evidence he challenges here.

In any event, defendant's claims are meritless. First, as to number. The 10 victim impact witnesses constituted 20 percent of the prosecution's case. In other words, 80 percent of the prosecution's phase was directed at other matters, primarily defendant's propensity for violence. Further, any argument attempting to put a numerical limit on evidence of this nature is of minimal persuasiveness. The question is the qualitative fairness of the evidence, not an arbitrary quantification. The testimony of each victim impact witness was relatively brief. The testimony of Los's father, for example, consists of 12 pages; her mother's, eight; her son's, two. The most extensive testimony, that of her fiancé, consumes 22 pages. The evidence, representing three generations of the victim's family, her former husband, coworkers and current fiancé, was neither unduly inflammatory nor unfairly prejudicial. (See *People v. Taylor* (2010) 48 Cal.4th 574, 646 [proper

52

to admit victim impact testimony of six family members representing four generations of the victim's close family].) The evidence was " 'very typical of the victim impact evidence we routinely permit.' " (*People v. Pearson, supra,* 56 Cal.4th at p. 467.)

Defendant's contends that victim impact evidence should be limited to testimony that describes the impact on family members present at the scene or immediately thereafter, and to those effects known or reasonably knowable to defendant at the time of the murder. We have previously rejected these arguments. (*People v. Pollock, supra,* 32 Cal.4th at p. 1183.) So too have we rejected the argument advanced here that victim impact evidence should provide no more than a quick glimpse into the victim's life. "The People are entitled to present a ' "complete life histor[y] [of the murder victim] from early childhood to death." ' " (*People v. Garcia* (2011) 52 Cal.4th 706, 751.) Nor did the trial court err in admitting the videotape of the dedication ceremony. In *People v. Huggins* (2006) 38 Cal.4th 175, we held that the testimony that the victim's "community. . . mourned her death by placing a bronze statue of her at the . . . public library" was permissible. (*Id.* at p. 239.) Admission of the videotape of still photographs of the living victim was likewise within the court's discretion. (*People v. Linton, supra,* 56 Cal.4th at pp. 1202-1204.)

Defendant contends further that the contrast between the victim's life and his own invited the jury to draw invidious comparisons. In support, he asserts that the prosecutor explicitly urged the jury to make these comparisons in her closing argument and, further, improperly raised the issue of race. Defendant failed to object to any of the identified statements, forfeiting the claim. (*People v. Lopez, supra,* 56 Cal.4th at p. 1073.) The claim is also without merit. The contrast the prosecutor drew between the victim's positive effect on the lives she touched and defendant's violent crimes was reasonable commentary on the weighing of

aggravating and mitigating circumstances and fell within the wide range of permissible argument. (See *People v. Dykes* (2009) 46 Cal.4th 731, 789-791.) The prosecutor's fleeting reference to the "Crips" when explaining the nature of defendant's gang was not an appeal to race, directly or implicitly. Her characterization of defendant as "sociopathic" was consistent with the evidence and fell within the permissible range of argument. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1172-1173.)

Defendant also challenges the court's instructions regarding consideration of this evidence. The trial court read CALJIC No. 8.84.1, which stated in part: "You must neither be influenced by bias nor prejudice against the defendant, nor swayed by public opinion or public feelings. In your consideration of whether the sentence of death is appropriate, you should not consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim." Defendant asserts this instruction was insufficient to guide the jury in the consideration of victim impact evidence and that the court, sua sponte, should have provided an instruction to that end. Defendant's claim is forfeited by his failure to request clarification or modification of the instruction. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1134.) Defendant asserts such a request would have been futile. We reject it for the same reason we rejected his previous claim of futility. Moreover, we have consistently "rejected the argument that a trial court must instruct the jury not to be influenced by emotion resulting from victim impact evidence." (*People v. Carey* (2007) 41 Cal.4th 109, 134.) We do so again.

## C. Instructional Claims

### 1. Lingering Doubt

Defendant assigns error for refusal to give a lingering doubt instruction. "There is no federal or state right to such an instruction. [Citations.] Rather, we

have held that 'the standard instructions on capital sentencing factors, together with counsel's closing argument, are sufficient to convey the lingering doubt concept to the jury.' [Citations.] Defendant cites no persuasive reason to revisit this conclusion." (*People v. Edwards* (2013) 57 Cal.4th 658, 765; accord, *People v. Rogers* (2013) 57 Cal.4th 296, 348-349; *People v. Streeter* (2012) 54 Cal.4th 205, 265-266.)

### 2. *CALJIC No. 8.85*

Defendant contends that CALJIC No. 8.85, the standard instruction identifying the aggravating and mitigating circumstances, is "constitutionally flawed." The defect, according to defendant, is that the instruction failed to advise the jury which factors were aggravating, which were mitigating, and which could be considered as either mitigating or aggravating depending of the jury's view of the evidence. "As defendant acknowledges, we have in the past repeatedly rejected [this] contention[]. Thus, we have held that the trial court is not obligated to identify which factors are mitigating and which are aggravating . . . ." (*People v. Lewis* (2008) 43 Cal.4th 415, 532; *People v. Farnam* (2002) 28 Cal.4th 107, 191.) We decline to reconsider this precedent.

### 3. *CALJIC No. 8.88*

Defendant raises familiar challenges to CALJIC No. 8.88, the standard jury instruction on how to weigh the aggravating and mitigating evidence. As defendant acknowledges, we have in the past rejected each of these contentions: "The court was not required to instruct the jury that (1) it could return a verdict of life imprisonment without possibility of parole even if the circumstances in aggravation outweighed those in mitigation; (2) it was required to return a verdict of life without possibility of parole if it found that the aggravating factors did not outweigh the mitigating factors or that death was not the appropriate punishment;

55

or (3) it could return a verdict of life without possibility of parole even in the complete absence of mitigating evidence. [Citations.] The term 'so substantial' as used in CALJIC No. 8.88 is not unconstitutionally vague [citation] and does not improperly direct a verdict in favor of death if the jury finds aggravation outweighs mitigation [citation]." (*People v. Whalen* (2013) 56 Cal.4th 1, 89.) "Finally, the trial court need not instruct the jury that life imprisonment without possibility of parole is presumed to be the appropriate penalty unless the prosecution proves to the contrary. [Citation.] We decline defendant's invitation to revisit these holdings." (*People v. Lewis, supra,* 43 Cal.4th at p. 534.)

### D. Trial Court Response to Jury Request for Clarification Regarding Life Without Possibility of Parole

Defendant requested an instruction that, if sentenced to death, the jury "must assume . . . the defendant . . . will be executed in the gas chamber or by lethal injection," and that, if sentenced to life without parole, the jury must "assume that he will not be paroled." The court declined to give the instruction. Instead, it gave the jury CALJIC No. 8.84: "It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which the special circumstances alleged in this case has been specially found to be true. [¶] Under the law of this state, you must now determine which of these penalties shall be imposed on the defendant."

During deliberations, the jury sent the court the following note: "If we vote for life imprisonment without the possibility of parole. Does that mean no good time off at all. Or he may be able to get out in 40 or 50 yrs or what ever. Will he spend his natural life in prison and never get out. [¶] If we vote for death penalty can the judge overturn our decision?"

56

After discussing the issue, and with the reluctant agreement of defense counsel, the court responded to the first question: "[Y]ou are not to speculate on such issues but are to follow the court's instruction previously given." Similarly, the court replied to the second question: "[Y]ou[] are instructed that you are not to speculate as to such issues but instead are instructed to concentrate on your responsibilities and functions as you have previously been instructed." The trial court's response was consistent with our recommended instruction on this point in *People v. Letner and Tobin, supra,* 50 Cal.4th at page 206.

Defendant now contends that both the court's response and CALJIC No. 8.84 were inadequate to properly convey the jury's sentencing responsibilities. His arguments rest on *Simmons v. South Carolina* (1994) 512 U.S. 154 and *Shafer v. South Carolina* (2001) 532 U.S. 36, a pair of United States Supreme Court decisions we have previously distinguished in decisions that rejected the same arguments defendant advances here. (*People v. Ervine* (2009) 47 Cal.4th 745, 810-812; *People v. Wallace* (2008) 44 Cal.4th 1032, 1089-1091; *People v. Abilez* (2007) 41 Cal.4th 472, 527-528; *People v. Prieto, supra,* 30 Cal.4th at pp. 269-271.)

### E. Asserted Disproportionality of Death Sentence

Defendant advances two proportionality claims. First, he argues that the death penalty is disproportionate when applied to a defendant convicted of felony murder as an aider and abettor because the statute does not require proof that he acted with a culpable state of mind, permitting him to be executed for an unintentional or accidental killing. Second, he asserts his punishment is disproportionate to his culpability under a *Dillon* analysis. (*People v. Dillon* (1983) 34 Cal.3d 441.) His arguments fail.

As noted above, section 190.2, subdivision (d) permits the imposition of a death sentence for a defendant who aids and abets the commission of a robbery that results in death when it is proven the defendant acted with reckless indifference to human life and was a major participant in the commission of the felony. "Th[is] portion of the statutory language . . . derives verbatim from the United States Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137 . . . . In *Tison*, the court held that the Eighth Amendment does not prohibit as disproportionate the imposition of the death penalty on a defendant convicted of first degree felony murder who was a 'major participant' in the underlying felony, and whose mental state is one of 'reckless indifference to human life.' [Citation.] The incorporation of *Tison*'s rule into section 190.2(d) — in express terms — brought state capital sentencing law into conformity with prevailing Eighth Amendment doctrine." (*People v. Estrada, supra,* 11 Cal.4th at p. 575.) Accordingly, we reject defendant's claim that his conviction under this section violates the Eighth Amendment. The assertion in his reply brief that *Tison* is no longer good law must be addressed to the United States Supreme Court.

Regarding his second claim, as defendant concedes, we have repeatedly held that intercase proportionality review is not required. (*People v. Carpenter* (1997) 15 Cal.4th 312, 421; *People v. Fierro* (1991) 1 Cal.4th 173, 253.) Defendant nonetheless persists, relying on *People v. Dillon, supra,* 34 Cal.3d 441, to argue that the death penalty is disproportionate to his culpability. Except in age, defendant bears no semblance to the immature 17-year-old defendant in *Dillon* who shot and killed his victim in a panic and was sentenced to life in prison despite the views of the judge and jury that his sentence was disproportionate to his moral culpability. (*Id.* at p. 487.) We need not repeat the facts of this case nor defendant's role as kingpin in a brief but violent and lethal crime wave. The penalty is not disproportionate to his culpability.

58

### F.  International Law

"Defendant contends he was denied the right to a fair and impartial trial by an independent tribunal in violation of customary international law as well as international treaties to which the United States is a party.  He also claims he suffered racial discrimination in violation of international law at both the guilt and penalty phases of his trial.  Because defendant has failed to establish his premise that he suffered violations of state or federal constitutional law, or that his rights to due process of law and to be free from racial discrimination were violated, we need not consider the applicability of those international treaties and laws to his appeal.  [Citation.]  In any event, ' "[i]nternational law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. " ' " (*People v. Tafoya* (2007) 42 Cal.4th 147, 199; see *People v. Lewis, supra*, 43 Cal.4th at p. 539 [The defendant's death sentence did not violate the International Covenant on Civil and Political Rights where, when it ratified the treaty, the United States " ' " specially reserved the right to impose the death penalty on any person, except a pregnant woman, duly convicted under laws permitting the imposition of capital punishment" ' "]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1055.)

### G.  Constitutional Challenges to the Death Penalty Statute

Defendant contends that California's death penalty statute is constitutionally invalid in numerous respects.  We have repeatedly rejected identical challenges to the statute and we do so again here.

" '[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court.' [Citation.]  We further 'reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death.' [Citations.]

"Contrary to defendant's assertion, the death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing, deprive a defendant of the right to a jury trial, or constitute cruel and unusual punishment because it does not require unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. [Citations.] 'Nothing in . . . *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed2d 403, 124 S.Ct. 2531], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], or *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], affects our conclusions in this regard.' [Citation.] 'Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review.' [Citation.] The jury may properly consider a defendant's unadjudicated criminal activity. [Citation.] 'Use of the adjectives "extreme" and "substantial" in section 190.3, factors (d) and (g) is constitutional.' [Citation.] [¶] 'The failure to require intercase proportionality does not guarantee "arbitrary, discriminatory, or disproportionate impositions of the death penalty." ' [Citations.] Moreover 'capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws . . . ,' due process of law, or the cruel and unusual punishment clause." (*People v. Edwards, supra,* 57 Cal.4th at pp. 767-768; see *People v. Linton, supra,* 56 Cal.4th at pp. 1215-1216; *People v. Whalen, supra,* 56 Cal.4th at pp. 90-92; *People v. Watkins, supra,* 55 Cal.4th at pp. 1034-1036; *People v. Elliott* (2012) 53 Cal.4th 535, 593-595.)

### H. Cumulative Effect of Error

Defendant asserts that numerous alleged errors, committed during both phases of his trial, cumulatively prejudiced him and require reversal of his conviction and of the judgment of death. We have either found no error or, in those instances where error has been found or assumed, no prejudice. Thus, there is no prejudice to accumulate.

## IV. RESTITUTION FINE

Defendant contends the trial court improperly imposed a $10,000 restitution fine without considering his ability to pay. As the Attorney General points out, when defendant committed his 1993 crimes and when he was sentenced in 1998, the relevant statutes authorized the trial court to consider a defendant's ability to pay in imposing the restitution fine. (Former § 1202.4, subd. (a); former Gov. Code, § 13967, subd. (a).) Defendant failed to raise this issue at his sentencing. Accordingly, his claim is forfeited. (*People v. Avila* (2009) 46 Cal.4th 680, 728-729.) Further, we assume the court was aware of and exercised its authority. Defendant cites no facts supporting a contrary conclusion.

## V. DISPOSITION

The judgment is affirmed.

CORRIGAN, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

61

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Williams

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S073205
**Date Filed:** August 24, 2015

_____

**Court:** Superior
**County:** Riverside
**Judge:** Timothy Heaslett


_____

**Counsel:**

R. Clayton Seaman, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Adrianne S. Denault and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

R. Clayton Seaman, Jr.
P.O. Box 12008
Prescott, AZ  86304
(928) 776-9168

Anthony Da Silva
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2608