Filed 9/18/20  P. v. Kelly CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JAMAL KELLY,<br><br>     Defendant and Appellant.</td><td>A158006<br><br>(Solano County Super.<br>Ct. No. FCR261329)</td></tr>
</table>

This is an appeal by Jamal Kelly from the order denying his petition, submitted in accordance with Penal Code[1] section 1170.95 (section 1170.95), to vacate his 2010 felony murder conviction.  The first issue presented is whether the trial court had the power to decide the question of whether Kelly was a major participant in the murder whose actions displayed a reckless indifference to life.  The second issue is whether substantial evidence supports the trial court's affirmative conclusion on that question.  We conclude the trial court had the power to act as it did, and that the court's decision is supported by substantial evidence.  In light of these conclusions, we affirm the order denying Kelly's petition.

**Procedural History**

In 2010, having been convicted by a jury of first degree felony murder, Kelly was sentenced to state prison for 25 years to life, the mandatory term then prescribed by law.

---

[1] Further undesignated statutory references are to the Penal Code.

The conviction was affirmed by this court in 2012. (*People v. Kelly* (Sept. 4, 2012, A129688) [nonpub. opn].)

In 2019, following enactment of Senate Bill No. 1437 (S.B. 1437), Kelly filed a petition asking to have his murder commission set aside. The general import of S.B. 1437 was to narrow the scope of liability for first and second degree murder. The definition of felony murder was tightened as follows: "A participant in the perpetration or attempted perpetration of a felony . . . in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (Pen. Code, § 189, subd. (e).)

In accordance with section 1170.95, subdivisions (c) and (d), the court (Hon. Michael Mattice, who presided at the trial) appointed counsel for Kelly, received a lengthy response from the prosecutor, and held a hearing. Copies of the trial record and our opinion were received in evidence. The court took the matter under submission, and in due course denied it in a 13-page order, concluding that the trial record amply demonstrated that Kelly had been a major participant in the killing and had acted with reckless indifference to human life.

## Trial Evidence

In our prior opinion, with Kelly referred to as defendant, we summarized the trial record as follows:

"On November 2, 2008, Deshawn Malone of Fairfield made a phone call to find some Ecstasy pills for himself and defendant. Seventeen-year-old Kendrick Lewis of Vallejo received a call from someone seeking to buy $200 worth of Ecstasy, and along with three friends drove to Fairfield to deliver the drug. Lewis's girlfriend, Karlee Swafford, was in the front passenger seat, Trung Nguyen was in the rear seat behind the driver, and Willie 'Tony' Muir was in the rear passenger seat. Lewis was driving.

2

"As they approached Mockingbird Lane, where Lewis and Malone had agreed to meet, Lewis pulled over to the curb but left the engine running.  Defendant and Malone approached the car, defendant near the driver's door and Malone near the rear driver's side door.  Malone had a gun and defendant knew that.  He also knew that Malone intended to rob the occupants of the car.

"Defendant put his hands on the lower edge of Lewis's rolled-down window, leaning into the car.  Lewis's attention was focused on defendant.

"As Lewis and defendant discussed the drug transaction, Malone became involved in an interchange with the back seat passengers. Nguyen had partially rolled down the rear driver's side window to get a better look at Malone, who he thought was behaving suspiciously.  According to Nguyen, Malone was offended by this and asked Lewis, 'Why is your friend looking at me all funny, bro?'

"According to defendant's testimony, though, Muir was wearing a Halloween mask referred to as a 'Jason mask,'[2] and Malone did not like it.  Malone told Muir to remove the mask but he refused.  Other witnesses testified that no one in the car was wearing the Jason mask, although such a mask was in the car.

"Lewis offered to sell defendant some blue Ecstasy pills, but defendant told him he wanted some green pills, which are stronger.  Lewis allowed defendant to touch the bag of pills but would not allow him to grasp onto it because defendant had shown him no money.  Someone handed Lewis some green pills from the back seat. Lewis also became aware that Malone was involved in some sort of confrontation with his rear seat passengers.  He told Malone not to worry about them.

"When Lewis placed the green pills in his lap, defendant stepped back from the car, turned to Malone and said, 'Do you want these?'  Malone then pulled a gun and stuck it into the rear driver's side window, waved it around inside the car, and said, 'I

_____

[2]  "This was evidently a mask of Jason Voorhees from the Friday the 13th movies. (Friday the 13th (Paramount Pictures, 1980).)

3

want those and those,' referring to the two quantities of Ecstasy pills.[3]  According to Nguyen, Malone demanded, 'I want everything.  Give us everything you all got.'  He also ordered the occupants of the car, 'Don't move, don't go off, don't drive off, or I'll shoot you.'

"Lewis began to pull the car forward and Malone shot him once in the back. Lewis remarked that he could not feel his feet, then lost control of the car.  The car swerved and crashed into a light pole across the street.  Officers responded quickly to a 911 call from Lewis's friends, but Lewis already showed no sign of life and bled to death despite efforts to save him.

"A single shell casing was found in the rear passenger compartment of Lewis's car.  Some blue pills resembling Ecstasy were found in the car on the driver's seat and floorboard, and a baggie with similar pills was found in the grassy area outside the car.  A Jason mask was recovered from the scene near the car.

"Malone and defendant ran off after the shooting.  According to a bystander they were laughing.  Defendant was arrested about a month later.  Identity was not an issue at trial.[4]

"Testifying in his own defense, defendant claimed he intended only to buy drugs with Malone and had no intention of robbing anyone.  He and Malone had decided to buy some Ecstasy, and as they were walking to get it, Malone pulled up his shirt and showed defendant a gun tucked into his waistband.  Malone said he was going to 'pull a lick,' meaning commit a robbery.  Defendant went along with Malone only because he did not want to look like a 'bitch' and lose respect in his neighborhood and because he was afraid of Malone.  He did not intend to help Malone in the robbery or to share in its proceeds.

---

[3]  Defendant admitted stepping away from the car but claimed it was *after* Malone produced the gun in order to avoid being shot; Swafford testified defendant stepped back *before* the weapon came out.

[4]  "It appears a breakthrough in the investigation may have come when Nguyen realized several days after the shooting that he recognized defendant from having previously lived in the same neighborhood."

4

He admitted, however, that Malone did not threaten or coerce him into going along. When asked by a detective what his 'mindset' was at the time of the offense, defendant said he was there to 'try to rob the dude of everything' but the '[d]ude wasn't giving it up.' He testified at trial that he had money to purchase the drugs, but he told police during their investigation that he had no money with him.

"Defendant testified he never intended for Lewis to be killed. He said he backed away from the car when Malone produced the gun and began to run away when he saw the shot fired. He read about the shooting in the newspaper but did not know Lewis had been killed until the police told him during their investigation. Defendant denied laughing as he ran off. He did not report Malone to the police because he did not want to be a 'snitch.' "

## The Trial Court's Decision

Because it is central to the issues advanced on appeal, the reasoning of Judge Mattice for denying Kelly's petition merits quotation (with minor, non-substantive, editorial modifications we have added, and deleting citations to our prior opinion):

"In the present case, did Jamal Kelly act as a major participant? If so, did he act with reckless indifference to human life? The Court finds beyond a reasonable doubt, and that a jury would also so find, if asked, that the answer to both questions is 'yes.'

"On the major participant question, as described above, and in the unpublished appellate court opinion, according to Kelly (the only source of this fact), Malone showed him the gun shortly before the crime and announced they were going to rob the victims as opposed to buying drugs from them. Kelly admitted at trial that Malone neither threatened nor coerced him into going along with the robbery. Contrary to his self-serving and credibility-challenged testimony at trial to the effect he was there just to buy drugs, he didn't want to rob, and he had very little involvement with the robbery, Kelly told police about a month after the crime that he was there to 'rob the dude of everything' and that he had no money at the time. Further, he never showed Lewis or the passengers any money during the robbery. The evidence shows that Kelly walked with Malone to the driver's side of the car and promptly took over as the negotiator and set-up man.

5

Kelly leaned into the driver's window, thus completely dominating Lewis's attention and immediately surrounding space and blocking Lewis's ability to see Malone. Kelly then talked Lewis into showing him two successive supplies of Ecstasy pills, which increased the visible loot. Then, as the Court of Appeal noted,

> " 'Defendant [Kelly] then arguably gave Malone a cue for the robbery by stepping back from the car and asking, "Do you want these?" to which Malone responded, "I want those and those." Defendant's move was inferably to give Malone access to the car's occupants, as well as to protect himself,'

"And Kelly's presence at the scene ' . . . would have made Malone's threats more intimidating to the car's occupants.' Thus, Kelly's actions were fundamental and essential causative events in the sequence leading to Lewis's death.

"Whether or not Kelly moved in order to *cue* Malone to start performing his role as the loot-taker and armed strongman may be arguable; but it is inescapably true that Kelly's prior activities plus his move collectively *enabled* Malone to commence his role. They also ' . . . allowed Malone to time the robbery attempt so as to get the weapon out of his waistband and into the car before anyone in the car could react.' By stepping back, Kelly also demonstrated that he was aware of the danger from the gun. He acted upon that awareness to protect himself, but did nothing and said nothing to anyone to reduce the danger to the car occupants, not while approaching the car with knowledge of the gun, not while talking to Lewis before stepping away from the car, not after stepping away, and not after Malone waved the gun around and pointed it at everyone inside the car. Kelly wanted the robbery to succeed; his later claim that he did not intend to share in the robbery loot—expected to be a quantity of Ecstasy—was 'inherently implausible' as the Court of Appeal noted. 'Drugs were the one sure thing Malone planned to get from the robbery. It is contrary to human experience to think defendant would not have shared in the drugs if the robbery had been successful.' After the shot, Kelly ran away with Malone, at least one of them laughing, and Kelly did absolutely nothing to check on or aid or summon aid for Lewis, who died shortly after the shot, at about 6:00 p.m. Later that same evening, Malone helped Kelly move his personal belongings from his mother's

house to that of a friend, thus showing that Kelly '. . . still allied himself with Malone even after the killing. And of course he [Kelly] did not report the crime to the police, not wanting to be a "snitch." '

"As the Court of Appeal commented, '[t]he evidence considered in totality powerfully suggests defendant was voluntarily involved in—and intended to assist—the robbery.' Kelly's voluntary and essential actions as the negotiator and set-up man, his proven intent to assist in the robbery, his enabling the commencement of Malone's role, all with knowledge of Malone's firearm, his immediate proximity and his contribution to the intimidating circumstances, his failure to mitigate the risk of [the] victim's death and his actions after the shooting all prove without doubt that Kelly was about as major a participant in the robbery and murder as Malone was. The *actus reus* is established.

"It is equally clear that Kelly acted with reckless indifference to human life. As noted above, the two requirements of being a major participant and having reckless indifference to human life significantly overlap, 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life. (*Tison v. Arizona* (1987) 481 U.S. 137, 153.' (*People v. Clark* (2016) 63 Cal.4th 522, 614-615.) In considering Kelly's *mens rea* in the context of his major participation, he was not a mere getaway driver as Enmund was in his case [*Enmund v. Florida* (1982) 458 U.S. 782] and Matthews was in the *Banks* case [*People v. Banks* (2015) 61 Cal.4th 788], nor was Kelly a person who made specific efforts to minimize the risk of violence in the felony, as Clark did in the first of his two murders, nor was Kelly a person who was absent from the scene of the killing and therefore had no opportunity to thwart it or assist the victim, as Miller was in his case [*In re Miller* (2017) 14 Cal.App.5th 960]. Instead, Kelly was right in the thick of things before, during, and after this drug-purchase-turned-robbery-and-murder, he initiated it and enabled it to happen, knowing of the gun, and he intended to share in the robbery proceeds. He turned away from the car to reduce his own risks from the gun but made no effort to reduce those risks for the car occupants, and did nothing to help the mortally wounded Lewis. He testified he went along with the robbery after being shown the gun because he did not

7

want to be seen as a 'bitch' and lose respect in the neighborhood, thus showing that he had more concern for his own personal reputation as a tough guy than he had for the lives and safety of the four car occupants. He spent more time with Malone that same evening. Although Kelly's trial testimony was an effort to distance himself from the robbery and the risks to human life that he had personally and comprehensively helped to create, his ' . . . after- the-fact testimony about his state of mind . . . was incompatible with the other evidence.' His personal efforts toward success of the robbery created and enhanced the risk to Lewis and the others that ripened into Lewis's death. As earlier noted, Kelly's stepping back from the driver's window also demonstrated that he was aware of the danger from the gun; he had helped create and elevate that danger for Lewis and his passengers, and he never did or said anything to reduce the danger for those victims. Kelly's deliberate and all-encompassing involvement here placed him at a point very close to the *Tison* end of the *Enmund-Tison* spectrum, and far distant from the *Enmund* end.[5] The requisite *mens rea* has been proven in this case, as Kelly's state of mind was one of reckless indifference to human life.

---

[5]  Judge Mattice characterized Enmund as "a mere getaway driver," " 'who [did] not himself kill, attempt to kill, or intend that a killing [would] take place or that lethal force [would] be employed.' " (Quoting *Enmund v. Florida*, *supra*, 458 U.S. 782, 797.) By contrast, he described the actions of the Tisons as "two brothers who, along with a third brother and other family members, planned to help the escape from prison of their father, Gary Tison, a convicted murderer sentenced to life, and the latter's cellmate, Randy Greenawalt, another convicted murderer. The three brothers smuggled firearms into the prison, used them to round up and lock up prison guards and visitors, and the five men fled the prison in a car, all without firing a shot. Then they switched cars to a Lincoln, and over the next two days worked their way on back roads and secondary highways . . . . When the Lincoln became disabled by a second flat tire, the men decided to stop and ambush a passing motorist and steal a car. One of the two petitioner brothers flagged down an approaching Mazda with four occupants, the Lyons family of three and the husband's niece, whereupon the other men, all armed, emerged from hiding, forced the family into the backseat of the Lincoln, took over the Mazda, and swapped possessions from each car to the other. The Lincoln was then driven further into the desert and completely disabled. After a discussion near the Lincoln by Gary Tison and Greenawalt about whether or not to kill the victims, in front of the victims and within hearing of the two petitioner brothers, Gary Tison sent the brothers to the Mazda to get some water as

"For all of these reasons, the Court finds that the People have proven beyond a reasonable doubt that Defendant Kelly is not eligible for resentencing under Penal Code section 1170.95, subdivision (a)(3), because he stands properly convicted of first degree felony murder . . . ."

## DISCUSSION

Kelly advances two contentions against Judge Mattice's order. First, he argues there is insufficient evidence to support the conclusion that he was a major participant in the Lewis killing who acted with reckless indifference to human life. Second, he insists reversal is required because "the prosecution may not argue a new theory to prove guilt beyond a reasonable doubt without a jury trial." Because of its more fundamental nature, we choose to address the second point first.

### I

Citing several decisions of the United States Supreme Court for the principle that a defendant has a Sixth Amendment right to have a jury decide any "factual issue that has a penal consequence" (*Apprendi v. New Jersey* (2000) 530 U.S. 466; *Ring v. Arizona* (2002) 536 U.S. 584; *United States v. Booker* (2005) 543 U.S. 220; *Cunningham v. California* (2007) 549 U.S. 270), Kelly argues that if the prosecution uses a different theory of guilt/participation from the one heard by the jury at the accused's trial, and if the trial court in ruling on a section 1170.95 petition embraces that changed theory, then he will be held in prison by reason of a new "factual issue" that was never run past and accepted by a jury.

Although it is not spelled out in detail, Kelly's thinking appears to run as follows: He was tried on a theory that he was the aider and abettor to Malone in the Lewis killing. The jury was instructed with CALCRIM No. 540 that Kelly could be convicted of felony murder "even if the killing was unintentional, accidental or negligent." That instruction, and the instructions on aiding and abetting (CALCRIM Nos. 400, 401) only told the jury

---

Mr. Lyons requested. While the brothers were at or returning from the Mazda with water or perhaps after they had returned, the older Tison and Greenawalt killed the victims with shotguns."

9

to decide whether Kelly, even if he was not present, intended to aid and abet, and whether his words or conduct "did[] in fact[] aid and abet" the robbery, not the killing.[6]  Thus, the jury was never called upon to decide either that Kelly was major participant or that he acted with reckless indifference to human life in the events that led to Lewis's death.  The trial court could not purport to decide that issue without contravening the *Apprendi* line of decisions.

This is creative reasoning, but we reject it on two grounds.

First, it is a settled principle of law that a right, even one of constitutional origin, may be lost if not asserted in a timely fashion.  (E.g., *United States v. Olano* (1993) 507 U.S. 725, 731; *People v. Trujillo* (2015) 60 Cal.4th 850, 856; *People v. McCullough* (2013) 56 Cal.4th 589, 593.)  Kelly did not raise the constitutional claim he now presses,[7] and he was content to have Judge Mattice decide the questions of whether he was major

---

[6]  As was emphasized in the prosecutor's closing argument:  "A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent."  "Under the felony murder rule, the killing can be . . . unintentional, accidental, even negligent, and a person is still responsible. . . .  [E]verybody who was involved in that underlying felony is responsible for the killing"  "It's simply that you're being held accountable for everything that you put in motion, every consequence that occurs.  So when somebody dies, you're responsible, because you helped that death happen.  You helped that underlying felony happen, and that's what created the death."  "The only question in this case was what was Mr. Kelly's involvement?  What was his intent when he walked up to that car?  . . .  Because if he intended to commit that robbery, if he intended to aid and abet Mr. Malone in committing that robbery, he's guilty of murder."  "This is a classic case of felony murder.  The defendant went there with Mr. Malone to steal drugs, to rob the victim of drugs.  The robbery did not go as planned.  The victim did not hand over the drugs.  Mr. Malone pulled out a gun and shot and killed Kendrick Lewis.  That's felony murder.  The defendant's participation in that robbery makes him responsible for it."

[7]  In point of fact, the only constitutional issues were raised by the prosecution, who argued S.B. 1437 was unconstitutional on five grounds.  The trial court rejected all of the prosecution's arguments, which do not figure on this appeal.

participant in Lewis's death or whether he acted with reckless indifference to human life decided on the basis of the trial record. The claim was not preserved for review.[8]

Second, if the issue had been preserved for review, we would also have to reject it on the merits.

Last year, we considered a claim that the changes made by S.B. 1437 could be raised on a direct appeal without going through the petition procedures established by section 1170.95. We rejected it with this language: "This argument is unpersuasive because the retroactive relief they are afforded by Senate Bill 1437 is not subject to Sixth Amendment analysis. Rather, the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights. (See *People v. Perez* (2018) 4 Cal.5th 1055, 1063–1064 [a trial court may make determinations of fact based on new evidence regarding a petitioner's eligibility for resentencing under Proposition 36[9]

---

[8]  Defendant's claim calls to mind *In re Sakarias* (2005) 35 Cal.4th 140, where our Supreme Court addressed the issue of when the prosecution may argue factually differing or inconsistent theories of guilt. This, too, is an issue that can be lost for review if not first raised in the trial court. (*People v. Krebs* (2019) 8 Cal.5th 265, 321–322; *People v. Spencer* (2018) 5 Cal.5th 642, 694.)

[9]  Proposition 36 established a post-conviction remedy whereby a Three Strikes prisoner could petition to be resentenced to a lesser term. What the Supreme Court said about that measure is equally applicable to the situation of a convicted murderer seeking relief under the petition procedure established by section 1170.95: "We now hold that the Sixth Amendment does not bar a trial court from considering facts not found by a jury beyond a reasonable doubt when determining the applicability of a resentencing ineligibility criterion under Proposition 36. [¶] . . . [¶] Proposition 36 . . . does not create an entitlement to resentencing; the finding of a fact that renders a petitioner ineligible for resentencing deprives him or her of an opportunity to have the trial court make a discretionary determination as to whether he or she should be resentenced. Moreover, Proposition 36 does not automatically reduce, recall, or vacate any sentence by operation of law. It is up to the inmate to petition for recall of the sentence, and at all times prior to the trial court's resentencing determination, the petitioner's original third-strike sentence remains in effect. Under this scheme, a factual finding that results in resentencing ineligibility does not increase the petitioner's sentence; it simply leaves the original sentence intact. We hold that the Sixth Amendment does not prohibit trial courts from relying on facts not found by a jury in determining the applicability of Proposition

11

because retroactive application of the benefits from the proposition are a legislative act of lenity that does not implicate Sixth Amendment rights].)" (*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156–1157.)  This position is now established.  (*People v. Howard* (2020) 50 Cal.App.5th 727, 740; *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1114–1115, rev. granted on other grounds Nov. 13, 2019, S258175.)

## II

S.B. 1437 specified three situations where relief under section 1170.95 would not be available.  The first is when the defendant "was the actual killer."  (§ 189, subd. (e)(1).)  This has no application because it is undisputed that Malone, not Kelly, fired the shot that killed Lewis.  The second is when the person seeking relief was an aider and abettor of the actual killer.  (*Id*., subd. (e)(2).)  The prosecution did not rely upon this ground in opposing Kelly's petition.  Instead, it was on the third statutory situation, that Kelly "was a major participant . . . and acted with reckless indifference to human life" (*id*., subd. (e)(3)), that the prosecution made its stand.  And it was on this ground that the trial court sustained the prosecution and ruled against Kelly.

We have only to determine whether that finding is supported by substantial evidence.[10]  (See *People v. Perez*, *supra*, 4 Cal.5th 1055, 1059, 1066.)  Kelly argues that it is not.  The limited scope of our review is governed by established principles:

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. . . .  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence.

---

36's resentencing ineligibility criteria." (*People v. Perez*, *supra*, 4 Cal.5th 1055, 1063–1064.)

[10]   The standard of review would be de novo if this was an original proceeding for habeas corpus relief, and the object of our review was a felony murder special circumstance precluding the possibility of parole.  (See *In re Taylor* (2019) 34 Cal.App.5th 543, 557.)

[Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. . . .' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [trier of fact's decision.] [Citation.] [¶] The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) And on this last point, it is no less pertinent that " ' "[c]ircumstantial evidence may be sufficient to connect a defendant with the crime and prove his guilt beyond a reasonable doubt." ' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Kelly is not allowed to simply reargue how the record is to be interpreted, as if this court was the finder of fact, which we most emphatically are not. (*People v. Thompson* (2010) 49 Cal.4th 79, 125.) No favorable interpretation of the evidence is given to him. Thus, no credence is given to his testimony that he had no criminal intent, but was present only out of fear of refusing Malone. In short, to prevail Kelly must convince us that no rational decision-maker could have denied his petition.

The terms "major participant" and "reckless indifference to life" are not new. (See Pen. Code, § 190.2, subd. (d), amended by the voters in 1990.) According to our Supreme Court, to be a major participant "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor." (*People v. Banks* (2015) 61 Cal.4th 788, 802 (*Banks*).) The court specified factors to be considered: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these

13

considerations is necessary, nor is any one of them necessarily sufficient.  All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major[.]' " (*Id*. at p. 803, fn. omitted.)

"As with 'major participant,' the phrase 'reckless indifference to human life' used in section 1902.subdivision (d) is taken from *Tison*, where the phrase 'reckless disregard for human life' is alternatively used." (*People v. Clark* (2016) 63 Cal.4th 522, 616 (*Clark*).)  The concept "encompasses both subjective and objective elements.  The subjective element is the defendant's conscious disregard of risks known to him or her.  But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities.  Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' (Model Pen. Code, § 2.02, subd. (2)(c).)  The commentary to this section of the code makes this clear:  '[T]he point is that the jury must evaluate the actor's conduct and determine whether it should be condemned.  The Code proposes, therefore, that this difficulty be accepted frankly, and that the jury be asked to measure the substantiality and unjustifiability of the risk by asking whether its disregard, given the actor's perceptions, involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.  (Model Pen. Code & Commentaries, com. to § 2.02, p. 237, fn. omitted.)" (*Id*. at p. 617.)  " ' "[R]eckless indifference to human life" is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death.' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1281.)

**Major Participant**

" '[M]ajor participation' should be understood as the phrase is used in common parlance, as including those whose involvement is ' "notable or conspicuous in effect or scope" ' and who are ' "one of the larger or more important members . . . of a . . . group." ' " (*Banks*, *supra*, 61 Cal.4th 788, 800, quoting *People v. Proby* (1998) 60 Cal.App.4th 922, 933–934.)  Kelly clearly qualifies.

The only one of the *Banks* factors clearly in Kelly's favor is that he did not supply the weapon. On the other hand, a number are obviously against him: Kelly was present at the immediate scene when Lewis was killed. Up to the moment he stepped back from the vehicle, it was Kelly who had been negotiating with Lewis while Malone stood where he could cover all occupants of the vehicle with the still-hidden weapon. Kelly did not provide the gun, but he was clearly aware of it prior to the meeting. Kelly certainly did nothing to prevent the weapon being produced or used by Malone. To the contrary, a rational trier of fact could conclude that Kelly's stepping back from the vehicle and asking Malone "Do you want these?" was a pre-arranged signal with Malone to produce the gun and commence the robbery. After Lewis was shot, Kelly ran from the scene with Malone.

Proof of Kelly's involvement in planning was hardly overwhelming, and was entirely circumstantial. Nevertheless, the deduction was there should the trier of fact elect to make it, which Judge Mattice clearly did.

In short, Kelly was involved in the killing from beginning to end. It could not have happened as it did without him. There is ample substantial evidence to support Judge Mattice's conclusion that "Kelly's actions were fundamental and essential causative events in the sequence leading to Lewis's death," thus qualifying Kelly as a major participant in the murder of Kendrick Lewis.

### Reckless Indifference To Human Life

At the outset, reckless indifference is not established by the nature of the crime in the abstract. It will not do to invoke the truism that the inherent nature of armed robbery entails the possibility of violent death: "*Enmund* and *Tison* together demonstrate that participation in an armed robbery, without more, does not involve 'engaging in criminal activities known to carry a grave risk of death.' " (*Banks*, *supra*, 61 Cal.4th 788, 805; see also *id*. at p. 810, fn. 9 ["Plainly, armed robbery does not [*per se*] qualify"].) The same authorities hold that the abstract possibility of death cannot demonstrate reckless indifference. (*Id*. at pp. 808 ["Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient"], 809 ["felony murderers . . . who simply had

15

awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life"]; accord, *Clark*, *supra*, 63 Cal.4th 522, 617 ["the fact that a robbery involves a gun . . ., on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life"].)

Certainly some factors do break in Kelly's favor.  Thus, no one in the Lewis vehicle was "held at gunpoint . . . or otherwise restrained . . . for [a] prolonged period." (*Clark*, *supra*, 63 Cal.4th 522, 620.)  As we noted in our prior opinion:  "Here, the attempted robbery and shooting occurred within a very brief time span."  Moreover, there is no evidence that Kelly anticipated resistance from the occupants "and the need to meet that resistance with lethal force."  (*Banks*, *supra*, 61 Cal.4th  788, 811.)  But the negative factors clearly preponderate.

Several factors adverse to Kelly are immediately recognizable.  Presence at the killing and afterwards counts.  (*Tison v. Arizona*, *supra*, 481 U.S. 137, 148; *Clark*, *supra*, 63 Cal.4th 522, 613–614.)  It is undisputed that Kelly was with Malone prior to the killing of Lewis, he was present with Malone at the time Lewis was killed, and that he and Malone fled the scene of the killing.

And, there is presence and then there is presence combined with conduct or inaction:  "Proximity to the murder and the events leading up to it may be particularly significant where, as in *Tison*, the murder is a culmination or a *foreseeable result of several intermediate steps* . . . .  In such cases 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts.  If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark*, *supra*, 63 Cal.4th 522, 619, emphasis added)  Here, not only was Kelly present from beginning to end, he was far from passive.  Quite the contrary.  Although it was Malone who initiated the drug purchase with Lewis, it was Kelly who initiated and actually conversed with Lewis, ostensibly negotiating the details of the purchase.  A rational trier of fact could deduce from these circumstances a level of existing trust

16

between Kelly and Malone that could indicate prior discussion and agreement on what would occur, and who would play what role, once contact with Lewis was made.[11] In other words, pre-crime planning.

Kelly's professed reluctance to involve himself cannot be reconciled with his actual conduct. He did not flinch, or recoil, or leave the scene when Malone produced the pistol. He did not express surprise or try to dissuade Malone from drawing the gun and using it to threaten the occupants of the car. (Remember that Malone extended his arm and hand holding the gun into the vehicle's interior.) At this point, use of lethal force was no longer purely theoretical.

Instead of trying to disassociate himself, Kelly seemed to anticipate it by acting as a decoy, to draw the vehicle occupants' attention to himself, thereby producing the maximum impact when they realized their peril. As already noted, by stepping back from the car, Kelly may have given the signal to Malone to produce the gun, thus escalating the risks of violence.[12] "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death that his or her actions create." (*Banks*, *supra*, 61 Cal.4th 788, 801.)

---

[11] That deduction is reinforced by the evidence that after the shooting of Lewis, Kelly and Malone separated, only to meet up again later that night, with Malone helping Kelly move to a new residence.

[12] As we stated on the prior appeal: "Defendant seems to argue he was simply in the wrong place at the wrong time with the wrong person. Yet he never attempted to remove himself from the scene, to persuade Malone not to commit the robbery, to alert the victims of the impending danger, or even to part company with Malone after the shooting. And though defendant testified he had no intent to aid the robbery, his actions say otherwise. [¶] . . . Defendant in fact assisted Malone by engaging Lewis in drug negotiations, which allowed Malone to time the robbery attempt so as to get the weapon out of his waistband and into the car before anyone in the car could react. . . . Indeed, his very presence would have made Malone's threats more intimidating to the car's occupants. [¶] . . . Defendant continued to stand nearby until after the fatal shot was fired, as he admitted seeing the gun go off."

It is here that we have the most damning detail. After he was arrested, Kelly voluntarily offered to speak with Detective Morris, who was leading the investigation into Lewis's death. Morris testified at trial as follows: "Q. Did he [Kelly] . . . tell you what he did when Mr. Malone pulled the gun? [¶] A. He said he backed up. [¶] Q. Did he say why he backed up? [¶] A. That *he wanted to get out of the way* of Mr. Malone pointing the handgun." (Emphasis added.) Get out of the way of what? The only possible answer is bullets fired by Malone. Thus, Kelly not only had prior knowledge that Malone had a gun, but that the gun was loaded. And that Malone was likely to fire it. As the Attorney General aptly puts it: "By stepping out of the line of fire, [Kelly] demonstrated that he knew the robbery involved a 'grave risk of death.' Plainly, by stepping back, [Kelly] made sure it was Lewis's life at risk and not his own."

Too true. In addition to showing a coordinated plan between Malone and Kelly, the latter's action in stepping back refutes Kelly's assertion that "there was no evidence [he] knew that the gun was operational and loaded." It also shows that Kelly was "aware of and willingly involved in the violent manner in which the particular offense [was] committed, demonstrating reckless indifference to the significant risk of death his . . . actions create[d]." (*Banks*, *supra*, 61 Cal.4th 788, 801.) A rational trier of fact could conclude that this action showed that Kelly " 'was subjectively aware that his or her participation in the felony involved a grave risk of death.' " (*People v. Williams*, *supra*, 61 Cal.4th 1244, 1281.)

There was also evidence from which a rational trier of fact could conclude that Kelly had prior knowledge of Malone's propensity or reputation for using lethal violence. Even following his arrest, and while in jail, Kelly feared retaliation by Malone if he talked to police about the killing.

In no way did any action by Kelly evidence an effort to minimize the risks of violence. (*Clark*, *supra*, 63 Cal.4th 522, 621–622.) He did not try to dissuade Malone from bringing the gun, brandishing it, or using it. He did nothing after the shooting but run away, laughing, with Malone. (Cf. *People v. Gonzalez* (2018) 5 Cal.5th 186, 204 ["this is not a case where defendants' actions after the shooting constituted actions that

18

they knew carried a grave risk of death, *such as if they abandoned the dying victim at the site of the crime without calling for medical assistance*," italics added].)

In summary, Kelly knew beforehand that Malone planned a robbery and was armed with a loaded firearm. When Kelly and Malone approached the Lewis vehicle and its occupants, Kelly took the lead by approaching the driver, Lewis, while Malone took up position on the other side of the vehicle, by the rear passenger. From this position, Malone could cover the two men in the rear seat and have a line of fire at Lewis in the driver's seat. From this position Kelly could "observe anything in [Malone's] actions just before the shooting that would have indicated that [Malone] was likely to engage in lethal violence." (*Clark*, *supra*, 63 Cal.4th 522, 621), namely produce the gun, brandish it inside the car, and demand of the occupants, "Give us everything you got." (Note Malone's use of the plural "us.") Thus, Kelly and Malone assumed a position of maximum tactical advantage, covering both sides of the vehicle and both front and back seats.

It was Kelly who opened discussion with Lewis about the proposed sale. This is significant in several respects. First, because Kelly's taking the initiative was at odds with his defense of reluctant involvement bordering on the involuntary. Second, because Kelly's discussion as to price and what type of Ecstasy pill was desired indicates a familiarity with the subject of drug transactions, likewise undercutting his defense of being a virtual conscript to an unknown situation. Third, because the first two indicate a level of existing trust between Kelly and Malone that could indicate prior discussion and agreement on what would occur, and who would play what role, once contact with Lewis was made.

After some discussion, according to the front seat passenger, Kelly stood up, looked at Malone, and stepped back, whereupon Malone's "whole arm . . . was in the car with the gun." Rear seat passenger Trung heard Kelly say to Malone "Do you want these?" or "Do you want this?" as he stepped back, and heard Malone say "Give us everything you got." This, as we emphasized in our prior opinion, as did Judge Mattice in his ruling, was crucial, for it showed Kelly attempting to remove himself at the very

19

moment Malone took the initiative and introduced the possibility of lethal violence for the four occupants in the limited space of the vehicle's interior.

It does not matter whether Kelly acted from agreement or fear. All that matters is that he did act, that his actions were volitional, and that those actions satisfy the objective and the subjective elements, namely, that Kelly " 'consciously disregard[ed] a substantial and unjustifiable risk' " by assisting Malone to achieve the robbery, and his disregard " 'involve[d] a gross deviation from the standard of conduct that a law-abiding person would observe in [his] situation.' " (*Clark*, *supra*, 63 Cal.4th 522, 617.) There is ample substantial evidence to support Judge Mattice's conclusion that Kelly acted with reckless indifference to human life in the events culminating in the murder of Kendrick Lewis.

### DISPOSITION

The order is affirmed.

_____

Richman, J.

We concur:


_____

Kline, P.J.


_____

Stewart, J.


*People v. Kelly* (A158006)

21